IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SAFE SKIES CLEAN WATER WISCONSIN, INC.,

    Plaintiff,

        v.                        Docket No. 20-cv-1086-wmc

NATIONAL GUARD BUREAU, et al.

    Defendants.

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

s/ Kathleen G. Henry
Kathleen G. Henry (WI Bar No. 1118591)
Dairyland Public Interest Law
PO Box 352
Madison, WI 53701
(608) 213-6857
khenry@dairylandpublicinterestlaw.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Introduction ...................................................................................................................1

Jurisdiction ...................................................................................................................1

Venue ...........................................................................................................................2

Standard of Review ......................................................................................................2

Standing .......................................................................................................................3

Factual Background ......................................................................................................2

Argument .....................................................................................................................8

   I. Defendants Violated NEPA by Failing to Prepare an Environmental Impact Statement .......8

   II. Defendants Violated NEPA by Failing to Prepare a Supplemental Environmental
      Assessment ...........................................................................................................9

   III. Defendants Violated NEPA by Improperly Segmenting Projects ......................................11

   IV. Defendants Violated NEPA by Failing to Consider Cumulative Impacts .........................12

   V. Defendants Violated NEPA by Failing to Adequately Consider Environmental Justice ....13

   VI. Defendants Violated NEPA by Failing to Adequately Address Alternatives ...................14

   VII. Defendants Violated NEPA by Failing to Adequately Consider Climate Change ...........15

   VIII. Defendants Violated NEPA and the APA by Failing to Provide
       Adequate Notice and Public Participation ...............................................................15

   IX. Defendants Violated the Administrative Procedure Act by Taking Action
      that is Arbitrary and Capricious and an Abuse of Discretion ...............................17

Conclusion ..................................................................................................................18

# TABLE OF AUTHORITIES

## Cases

*Center for Biological Diversity v. National Highway Traffic Safety Administration*,
538 F.3d 1172 (9th Cir. 2008) ................................................................15

*City of Los Angeles v. NHTSA*, 912 F.2d 478 (D.C.Cir.1990).....................................16

*City of Rochester v. United States Postal Serv.*, 541 F.2d 967 (2d Cir.1976) ..............11

*City of West Chicago, Ill. v. U.S. Nuclear Regulatory Com'n*, 701 F.2d 632 (7th Cir. 1983)........11

*Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658 (D.C.Cir. 1996)........................................16

*Habitat Educ. Center v. U.S. Forest Service*, 609 F.3d 897 (7th Cir. 2010) ...................13

*Habitat Educ. Center, Inc. v. U.S. Forest Service*, 673 F.3d 518 (7th Cir. 2012) .........10

*Heartwood, Inc. v. United States Forest Serv.*, 230 F.3d 947 (7th Cir.2000).................8

*Highway J Citizens Group v. Mineta*, 349 F.3d 938 (7th Cir. 2003).....................3, 9, 18

*Highway J Citizens Group, U.A. v. U.S. Dept. of Transp.*, 656 F.Supp.2d 868,
70 ERC 2039 (2009) ...................................................................................3

*Indiana Forest Alliance, Inc. v. United States Forest Serv.*, 325 F.3d 851 (7th Cir.2003) ...........17

*Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)..............17

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 29 ERC 1508,
104 L.Ed.2d 377, 57 USLW 4504 (1989)..........................................................9, 17

*Mid States Coalition for Progress v. Surface Transp. Bd.*, 345 F.3d 520 (8th Cir. 2003) .............13

*Nucleus of Chicago Homeowners Ass'n v. Lynn*, 524 F.2d 225 (7th Cir. 1975) ...........................14

*River Road Alliance, Inc. v. Corps of Engineers of U.S. Army*, 764 F.2d 445
(7th Cir. 1985)...........................................................................................14, 16

*Sierra Club v. Franklin Cty. Power of Ill., LLC,* 546 F.3d 918 (7th Cir. 2008) .............................3

*Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) ...................3

**Statutes**

5 U.S.C. § 701 - 706 ...................................................................................................1, 2

5 U.S.C. § 702 ...............................................................................................................2

5 U.S.C. § 706 ...............................................................................................................2

5 U.S.C. § 706(2)(A) ...................................................................................................17

5 U.S.C. § 706(2)(A), (C), (D), (E), (F) .....................................................................18

28 U.S.C. § 1331 ............................................................................................................1

28 U.S.C. 1391(e)(1)(B) ................................................................................................2

28 U.S.C. 2201-2202 .....................................................................................................2

28 U.S.C. § 2412 ............................................................................................................1

28 U.S.C. § 2412(d) .......................................................................................................2

42 U.S.C. § 4321 *et seq* ...........................................................................................1, 8

42 U.S.C. §§ 4331 *et seq* .............................................................................................1

42 U.S.C. § 4332(2)(c) ....................................................................................1, 8, 9, 14

40 U.S.C. § 4332(2)(E) .................................................................................................14

**Regulations**

32 C.F.R. Part 989 .........................................................................................................8

40 C.F.R. Parts 1500 to 1508 ........................................................................................8

40 C.F.R. § 1501.5 .........................................................................................................8

40 C.F.R. § 1502.9(c)(1) ................................................................................................9

40 C.F.R. § 1508.25(a) .................................................................................................11

40 C.F.R. § 1508.25(c) .................................................................................................12

40 C.F.R. § 1508.5 .........................................................................................................8

40 C.F.R. § 1508.8 ...................................................................................................................12

**Rules**

Fed.R.Civ.Pro. 56(a) ..................................................................................................................2

## INTRODUCTION

Safe Skies Clean Water Wisconsin ("Safe Skies") challenges a decision of the National Guard Bureau ("NGB") to issue an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") for Construction and Demolition Projects at the 115th Fighter Wing Installation, Dane County Regional Airport, Madison, Wisconsin, instead of issuing an Environmental Impact Statement ("EIS"). (Complaint, ¶ 1.)

Safe Skies' claims arise under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.; the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d); and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

The NGB, on behalf of the Air National Guard ("ANG"), prepared an EA to evaluate the potential consequences to the human and natural environment that would result from implementation of construction and demolition projects ("the Project") at the 115th Fighter Wing ("115 FW") of the Wisconsin Air National Guard ("WIANG"). (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 3.)

Safe Skies argues that the NGB acted illegally by a) preparing an EA rather than an EIS as required by NEPA, 42 U.S.C. § 4332(2)(c), and failing to adequately study and disclose the major and significant environmental effects of the project; b) by issuing a FONSI, thereby disregarding the major and significant environmental effects of the project; and c) acting arbitrarily, capriciously and with abuse of discretion, or otherwise not in accordance with the law, and without observance of procedure required by NEPA and the APA. (Complaint, ¶ 6.)

## JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1331, because this action arises under the laws of the United States, including the National Environmental Policy Act, 42 U.S.C. §§ 4331

*et seq.*; the Administrative Procedure Act, 5 U.S.C. §§ 701-706; the Declaratory Judgment Act, 28 U.S.C. 2201-2202; and the Equal Access to Justice Act, 28 U.S.C. § 2412.

An actual, justiciable controversy exists between plaintiff and defendants. The requested declaratory judgment relief is therefore proper under the Declaratory Judgment Act, 28 U.S.C. 2201-2202; and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

The United States has waived sovereign immunity with respect to the claims raised herein under 5 U.S.C. § 702. Plaintiff has exhausted all administrative remedies and has no adequate remedy at law.

## VENUE

Venue is proper in this Court under 28 U.S.C. 1391(e)(1)(B) because "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the Plaintiff resides if no real property is involved in the action." 28 U.S.C. 1391(e)(1)(B).

The property that is the subject of the action is in Madison, WI, and Plaintiff is located in Madison, WI. (PPFOF ¶ 5.)

## STANDARD OF REVIEW

Under the APA, this Court "shall . . . hold unlawful and set aside agency action . . found to be – (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;. . . (C) in excess of statutory jurisdiction, authority, or limitations . . . ; [or] (D) without observance of procedure required by law . . . ." 5 U.S.C. § 706. The APA gives this Court jurisdiction over the NGB's compliance with NEPA. Under Fed.R.Civ.Pro. 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."

## STANDING

Plaintiff has organizational standing to bring this action because (1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit. *Sierra Club v. Franklin Cty. Power of Ill., LLC,* 546 F.3d 918, 924 (7th Cir. 2008). In addition, Plaintiff's members: (1) will suffer an injury-in-fact that (2) is fairly traceable to the challenged actions and (3) is likely to be redressed by a favorable court decision. *Highway J Citizens Group, U.A. v. U.S. Dept. of Transp.*, 656 F.Supp.2d 868, 876 70 ERC 2039 (2009), citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009). (The analysis of standing in the District Court case of *Highway J Citizens Group* was affirmed by the 7th Circuit in *Highway J Citizens Group v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003)). The Declarations of Steven Klafka, Edward Blume and Tehmina Islam, filed concurrently with this Brief and Motion for Summary Judgment, demonstrate these factors for Plaintiff.

## FACTUAL BACKGROUND

### The 115th Fighter Wing and the Project

The 115th Fighter Wing ("115 FW") is a unit of the Wisconsin Air National Guard, ("WIANG") which is stationed at Truax Field Air National Guard Base, Madison, Wisconsin. (PPFOF ¶ 21.) Since 1942, the Truax Field Base has stored petroleum and various types of hazardous materials including fire-fighting foam. (PPFOF ¶ 21.)

In 2015 and 2017, the NGB commissioned a study of nine potential release sites ("PRLs") that could be releasing perfluorinated compounds ("PFCS" – perfluorobutane sulfanate

("PFBS"), perfluorooctanoic acid ("PFOA"), and perfluorooctane sulfanate ("PFOS"); cumulatively referred to as "PFAS" in the Complaint and in this Brief). (PPFOF ¶ 24.)

Per- and polyfluoroalkyl substances (PFAS) refers to a large group of man-made chemicals that include PFOA, PFOS, GenX, and thousands of other chemicals. PFOA and PFOS have been the most extensively studied and are currently the only two PFAS chemicals for which the USEPA has established lifetime drinking water Health Advisories for ground water (0.07 microgram per liter [μg/L] of PFOS, PFOA, or the combined concentrations of the two compounds) and calculated Regional Screening Levels for soil (1,260 micrograms per kilogram [μg/kg]). (PPFOF ¶ 9.)

The Final Report prepared for the NGB was released in March, 2019 (the Complaint incorrectly gives this date as October, 2019.) (PPFOF ¶ 24.) The Final Report shows that there is PFAS contamination in excess of the USEPA guidelines in soil in two of the sites, and in the groundwater at all nine sites including at the base boundary. (PPFOF ¶ 25.) The Report recommended further investigation at all nine sites to determine the nature and extent of the PFAS release on and off the base in soil and groundwater. (PPFOF ¶ 26.)

In October, 2019, the NGB issued an EA and FONSI for 27 separate construction and demolition actions (hereinafter, "sub-parts" of the Project) at the 115th Fighter Wing Installation, Dane County Regional Airport, Madison, Wisconsin. (PPFOF ¶ 27.)

The purported purpose of the Project is to:

provide the facilities and training opportunities necessary to ensure that the 115 FW can accomplish their mission in a safe and efficient manner. For the 115 FW to continue to meet their mission goals, the NGB needs to provide facilities that are properly sized and configured to meet the demands of the continuously evolving mission of the 115 FW. The proposed construction and renovation projects will improve mission efficiency by improving base access and utilities, consolidating mission functions, and upgrading facilities to meet current safety

4

and security standards. The proposed demolition actions will remove excess, obsolete, deteriorating, and underused facilities. (PPFOF ¶ 28.)

New construction will result in the disturbance of 25.1 acres of land, and a net increase of 1.2 acres of new impervious surface. (PPFOF ¶ 29.) Preliminary estimates of the construction required place the total cost of construction, demolition, and renovation between 40 and 60 million dollars. (PPFOF ¶ 30.)

At the same time that the Report on PFAs was issued and that the NGB was drafting and submitting the EA for comments, the Air Force was preparing an Environmental Impact Statement ("EIS") for the F-35A Operational Beddown Air National Guard. (PPFOF ¶ 31.)

The draft EIS was put out for Comment on February 7, 2019, and the draft EA put out for Comment on April 7, 2019. (PPFOF ¶ 32.) The EIS was finalized in February 2020, just a few months after the EA was finalized. EIS. (PPFOF ¶ 33.)

On page 1-1 of the EIS, the Air Force states, "The F-35A would replace the existing F-15, F-16, or A-10 fighter attack aircraft…." (PPFOF ¶ 34.)

### The City of Madison's Drinking Water Supply and PFAS in Wells

The City of Madison relies on wells for its public drinking water supply. (PPFOF ¶ 36.) The City has been aware of PFAS problems in drinking water for years, and the City has detected PFAS in every well in Madison. (PPFOF ¶ 37.) The municipal well closest to Truax Air Field ("Well No. 15") was shut down in 2019 by the City of Madison due to the PFAS contamination in that well. (PPFOF ¶ 38.) The City is monitoring all other municipal wells, with the highest levels of PFAS contamination indicated near and southeast of the base. (PPFOF ¶ 39.)

As the Final Report shows, PFAS are known to be present in groundwater at Truax Field, and very likely are present off-Base:

Given that groundwater flow is to the east/southeast and that samples at the Base Boundary have exceedances, groundwater with PFC concentrations above applicable screening criteria is very likely present off-Base to the south and east. (PPFOF ¶ 40.)

### The 303(d) Impaired Waters in the Madison Area

The west branch of Starkweather Creek drains the area around the Airport and flows into Lake Monona. (PPFOF ¶ 41.) Both Starkweather Creek and Lake Monona are on the 2018 Wisconsin Impaired Waters List for multiple pollutants. (PPFOF ¶ 42.) The 2019 report on PFAS found that PFAS levels in groundwater samples were *569 times* the EPA health advisory level. (PPFOF ¶ 43.) Soil PFOS levels were up to *29 times* the EPA health advisory level in one location. (PPFOF ¶ 44.)

### The Proposed F-35As that are Coming to Madison

The Air Force prepared an Environmental Impact Statement ("EIS") for the F-35A Operational Beddown Air National Guard. (PPFOF ¶ 31.) The Air Force selected Madison as a location for the F-35As. (PPFOF ¶ 34.) F-35As will be four times noisier than the current F-16s. (PPFOF ¶ 53.)

### Safe Skies and Its Members will be Harmed by the Proposed Action because it will cause Increased PFAS Emissions and Noise from the F-35As

Safe Skies is a nonprofit corporation organized under the laws of Wisconsin. (PPFOF ¶ 6.) Safe Skies' purpose is to educate the public concerning the dangers inherent in basing F-35A Joint Strike Fighter jets at Truax Air National Guard base in Madison as well as the need for the NGB, Air National Guard and Air Force to clean-up existing contamination of groundwater, surface water, drinking water and soils, caused by the use of fire-fighting foams and other materials on the base. (PPFOF ¶ 7.)

Safe Skies is concerned about the large amount of per- and polyfluoroalkyl substances ("PFAS") emitted from the base and known to be polluting municipal wells, particularly in low-

income neighborhoods near the airport, as well as the groundwater, soils, Starkweather Creek and Lake Monona, which may eventually affect the entire Yahara chain of lakes. (PPFOF ¶ 8.)

Safe Skies is also concerned about the noise impacts from the F-16s and the proposed F-35s. (PPFOF ¶ 10.)

Safe Skies accomplishes its mission by informing the local citizenry of the NGB's plans and their potential negative environmental and socioeconomic impacts on the community by means of a website, newsletters, forums and public activity. It has a mailing list of over 2,000 people. (PPFOF ¶ 11.)

Since 2018, Safe Skies has sponsored a series of public forums, appeared on radio shows, and brought speakers to Madison for presentations, press conferences and interviews. (PPFOF ¶ 12.)

Many of Safe Skies' members reside in locations that have suffered from PFAS emissions, and will suffer the impacts of the increased emissions of PFAS that will result from the construction activities authorized in the EA in that they drink from wells that already have PFAS in them, and some eat fish from Starkweather Creek that also have PFAS in them. (PPFOF ¶ 13.)

Many of Safe Skies' members reside near the Airport and in the flight path and those supporters will suffer greatly from the increased noise the F-35s will bring to Madison. (PPFOF ¶ 14.)

This Court can redress Plaintiff's injuries by granting summary judgment and ordering the NGB to prepare an Environmental Impact Statement and/or a Supplemental Environmental Assessment. (PPFOF ¶ 16.)

**The NGB is the Proper Defendant**

The NGB is a joint activity of the Department of Defense (DOD Directive 5105.77.)
(PPFOF ¶ 17.) The NGB, as an agency of the federal government, is required to comply with
various laws and regulations, including the National Environmental Policy Act ("NEPA"; 42
U.S.C. §§ 4321 *et seq.*), the Council on Environmental Quality's NEPA regulations, 40 C.F.R.
Parts 1500 to 1508, and the Air Force's own NEPA-implementing regulations, 32 C.F.R. Part
989. The NGB is the lead agency for the EA pursuant to 40 C.F.R. §§ 1501.5 and 1508.5.
(PPFOF ¶ 19.) General Daniel R. Hokanson is the current Chief of the National Guard Bureau.
(PPFOF ¶ 20.) He is named as a defendant in his official capacity.

**ARGUMENT**

**I.     Defendants Violated NEPA by Failing to Prepare an
Environmental Impact Statement**

NEPA requires that federal agencies prepare an EIS for "major Federal actions
significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c).

The NGB's issuance of a FONSI and its accompanying EA in lieu of an EIS violates
NEPA because the construction activities, taken together, are a major Federal action with
significant cumulative and secondary environmental impacts. In determining that no EIS was
required with respect to the project, the NGB failed to comply with NEPA. The EA fails to take a
hard look at the effects of the construction and land disturbance on the soil and water and
potential releases of hazardous substances.

> …All federal agencies must prepare an "environmental impact statement" ("EIS")
> for "major Federal actions significantly affecting the quality of the human
> environment." 42 U.S.C. § 4332(2)(C); see also *Heartwood, Inc. v. United States
> Forest Serv.*, 230 F.3d 947, 949 (7th Cir.2000). This report is "a detailed analysis
> and study conducted to determine if, or the extent to which, a particular agency
> action will impact the environment." *Heartwood*, 230 F.3d at 949.

In evaluating whether an EIS is necessary, Council on Environmental Quality ("CEQ") regulations instruct that the term "significantly" in the statute requires consideration of both "context" and "intensity." 40 C.F.R. § 1508.27(a)-(b). Intensity in turn requires agencies to consider, among other factors, "the degree to which the proposed action affects public health and safety"; "the degree to which the effects on the quality of the human environment are likely to be highly controversial"; and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." *Id*. § 1508.27(b)(2), (4), (5).
*Highway J Citizens Group v. Mineta*, 349 F.3d 938, 954 (7th Cir. 2003).

In this case, the NGB failed to consider the effects of the construction of the Project on the PFAS levels that would leave Truax either by soil or groundwater contamination. (PPFOF ¶¶ 49, 51.) The NGB has failed to comply with the request to clean up PFAS and therefore cannot possibly have studied the effects of increased PFAS on human health, fish consumption, pollution of groundwater and drinking wells. (PPFOF ¶ 58.) There is no "hard look" in the EA at the levels of PFAS that will be emitted during the construction projects.

## II.     Defendants Violated NEPA by Failing to Prepare a Supplemental Environmental Assessment

CEQ regulations require agencies to supplement an EA or EIS if the agency makes substantial changes to the proposed action or significant new circumstances or information arise bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(c)(1). "If there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared. *Cf*. 42 U.S.C. § 4332(2)(C)." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 29 ERC 1508, 104 L.Ed.2d 377, 57 USLW 4504 (1989).

The Courts require agencies to: "…take a hard look at the new information and determine if supplementation is necessary." *Habitat Educ. Center, Inc. v. U.S. Forest Service*, 673 F.3d 518, 528 (7th Cir. 2012).

In this case, there is a great deal of significant new information that makes the EA inadequate.

In the same month that the EA was issued, in October, 2019, high levels of PFAS were found in Starkweather Creek, and the Wisconsin Department of Natural Resources ("DNR") sent a letter to the City, Dane County and National Guard notifying them that all were legally responsible for contamination at two "burn pits" where firefighters had trained with PFAS foams. (PPFOF ¶ 45.)

Also in October 2019 the Mayor of the City of Madison called on the Air National Guard to address contamination at Truax Field. (PPFOF ¶ 46.) There is no evidence the ANG addressed the contamination. (PPFOF ¶ 47.)

A year later, in November 2020, the City sought additional funds for PFAS testing and planning at the Dane County Regional Airport, Air National Guard 115th Fighter Wing Base, and surrounding area. (PPFOF ¶ 48.)

The NGB should supplement this EA after conducting the testing sought by the DNR and City of Madison. The NGB has never dealt with the existing PFAS contamination, never dealt with the pollution of drinking wells, and should not be allowed to conduct the projects in the EA without first dealing with existing pollution and studying and documenting how increased PFAS emissions will contribute to fish and water pollution. (PPFOF ¶ 49.) The NGB is endangering the health of Plaintiff's members. (PPFOF ¶ 13, 15.)

### III.     Defendants Violated NEPA by Improperly Segmenting Projects

Actions that are "similar" or "connected" or that have cumulative effects must be considered together in one EIS. 40 C.F.R. § 1508.25(a). NEPA prohibits separating major projects into segments. "'Piecemealing' or 'segmentation' allows an agency to avoid the NEPA requirement that an EIS be prepared for all major federal action with significant environmental impacts by segmenting an overall plan into smaller parts involving action with less significant environmental effects. *City of Rochester v. United States Postal Serv*., 541 F.2d 967, 972 (2d Cir.1976)." *City of West Chicago, Ill. v. U.S. Nuclear Regulatory Com'n*, 701 F.2d 632, 650 (7th Cir. 1983).

The NGB improperly segmented this project from the F-35 Operational Beddown Project, because the purpose of this project is to prepare for the F-35s to be brought to Madison. On page 1-1 of the EIS, the Air Force states, "The F-35A would replace the existing F-15, F-16, or A-10 fighter attack aircraft…." (PPFOF ¶ 34.) This statement shows Plaintiff that the work in the EA is not being done with the expectation for keeping F-16s at Truax, but is being done in preparation for F-35s. (PPFOF ¶ 34.) The EIS for the F-35 and EA for this Project are improperly separated. The EA does not look at the totality of the impacts of increased PFAS emissions from land disturbance and creation of impervious surfaces and their potential impact on groundwater and drinking water. (PPFOF ¶ 51, 52, 55.)

The EA also discusses a much smaller quantity of greenhouse gases that will be emitted than if the projects were discussed together. (PPFOF ¶ 65.) The EA neglects to mention that, "an increase in airfield $CO_2$e emissions of approximately 12,478 tons or 135 percent." (PPFOF ¶ 65.) This amount is not "insignificant" in light of the dire situation the climate is in.

Because the F-35 Beddown assumes the completion of this Project and because the F-35 Beddown and this Project are similar and connected and have cumulatively significant environmental effects, defendants should have evaluated both projects in one EIS.

### IV.   Defendants Violated NEPA by Failing to Consider Cumulative Impacts

CEQ regulations require an agency to consider the "direct," "indirect," and "cumulative" impacts of a proposed action. 40 C.F.R. § 1508.25(c). Cumulative impact is defined in 40 C.F.R. § 1508.7 as the following: "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." In addition, "Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8.

The NGB violated NEPA by failing to consider the cumulative impacts of this Project on the environment and the health of the public. The adverse health impacts could include increased PFAS emissions in Starkweather Creek, Lake Monona, public drinking water systems, in fish consumed by the public; and in climate-change causing pollutants released from the construction, and in the deafening noise and air and water pollutants from the F-35s. (PPFOF ¶¶ 49, 51, 52, 58.)

The NGB is aware that surface water from Truax flows off the Base:

"3.5 Surface Water Hydrology: Surface water drainage from the Base ultimately drains west into Starkweather Creek, which surrounds the Base on the north, west, and south sides. Starkweather Creek empties into Lake Monona approximately 2 miles to the south. Surface water flow around the Base is directed by man-made

ditches and culverts which connect to Starkweather Creek. Because much of the Base is paved, infiltration and evapotranspiration of surface water are negligible." (PPFOF ¶ 54.)

Yet the NGB is not studying the PFAS that are known to be polluting the Base and the extent that the PFAS are traveling off the Base. (PPFOF ¶ 49.)

Additional adverse impacts are that water bodies already classified as impaired under Section 303(d) of the Clean Water Act could be made even more polluted by the increased amounts of PFAS and other toxins that will migrate from the base into the groundwater and stormwater. (PPFOF ¶ 53.)

Here, the challenged cumulative impacts are predictable and therefore the NGB should take a hard look at them. *Habitat Educ. Center v. U.S. Forest Service*, 609 F.3d 897, 902 (7th Cir. 2010).

The NGB should be forced to take a hard look at the cumulative impacts of the construction projects planned in the EA.

## V.    Defendants Violated NEPA by Failing to Adequately Consider Environmental Justice

Executive Order 12,898 requires federal agencies to determine whether a project will have a disproportionately adverse effect on minority and low-income populations. 59 Fed. Reg. 7629 (Feb. 16, 10040). "The purpose of an environmental justice analysis is to determine whether a project will have a disproportionately adverse effect on minority and low-income populations." *Mid States Coalition for Progress v. Surface Transp. Bd*., 345 F.3d 520, 541 (8th Cir. 2003).

The NGB failed to take a hard look at the impacts of the Project on low-income and minority communities. The NGB never implemented a detailed community outreach strategy

aimed at gaining local input from all communities that would be affected and did not specify targeted activities to reach low income and/or minority communities. (PPFOF ¶ 69.)

The EA points out that 18% of the City of Madison's low-income population lives in the vicinity of the 115 FW installation, but claims that no pollutants will leave the site during the work on the Project and therefore low-income and minority populations will not be adversely affected. (PPFOF ¶ 56.) The NGB has not completed the investigation recommended in the 2019 Report to determine the extent to which PFAS are migrating off-base. (PPFOF ¶ 58.)

The City of Madison did find that the PFAS migrated off-base and the City closed Well No. 15. (PPFOF ¶ 38.) As PFAS continue to migrate off-base, the pollutants will have a disproportionate impact on low-income and minority populations who live near the Base, drink from the City water, fish in Starkweather Creek for subsistence fishing, and live and recreate near the contaminated soil. (PPFOF ¶ 51.)

Defendants should be required to conduct an adequate environmental justice analysis as required by law.

### VI.    Defendants Violated NEPA by Failing to Adequately Address Alternatives

The defendants failed to take a hard look at the alternatives. The NGB failed to consider completing only the sub-projects which would not result in land disturbance and therefore not have the potential to increase emissions of PFAS.

> Section 102(2)(E) of the National Environmental Protection Act requires the agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 40 U.S.C. § 4332(2)(E). This requirement is independent of the question of environmental impact statements, and operative even if the agency finds no significant environmental impact. E.g., *Nucleus of Chicago Homeowners Ass'n v. Lynn, supra*, 524 F.2d at 232 [524 F.2d 225 (7th Cir. 1975)].

*River Road Alliance, Inc. v. Corps of Engineers of U.S. Army*, 764 F.2d 445, 452 (7th Cir. 1985).

In this case, defendants failed to take a look at any alternative other than not doing the project, and it was a foregone conclusion they would do the project. They violated the law by not taking a hard look at alternatives that would release fewer PFAS into the environment that will negatively affect human health.

### VII.   Defendants Violated NEPA by Failing to Adequately Consider Climate Change

Defendants admit the construction will result in increased climate-change causing pollutants and that the construction will emit 3,405 metric tons of $CO_2$ per year of construction. (PPFOF ¶ 61.) Defendants cite CEQ guidance that says federal agencies should only consider emissions that total 25,000 metric tons for consideration in NEPA documents. (PPFOF ¶ 63.) Defendants further gloss over the significance of its actions by saying that impacts of greenhouse gas emissions will "contribute incrementally" to the problem. (PPFOF ¶¶ 61, 62.) Furthermore, this work is being done in preparation for the F-35s to be located at Truax and those planes will cause increased levels of greenhouse gas emissions in construction and operation. (PPFOF ¶ 64.) While the EA mentions the additional 731 tons of $CO_2$ emissions for F-35 construction projects, the EA fails to disclose or discuss the additional 12,478 tons or 135 percent from the operation of the F-35s. (PPFOF ¶¶ 64, 65.) The incremental changes are less incremental. By failing to include all the emissions, and by failing to recognize that incremental changes are leading us to catastrophe, the NGB violates the NEPA by failing to adequately consider climate change.

In *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172 (9th Cir. 2008), the 9th Circuit Court of Appeals held that a federal agency violated NEPA in preparing an EA instead of an EIS, in part because the agency failed to quantify the cumulative impacts of the greenhouse gas emissions. 538 F.3d at 1217. "'[W]e

cannot afford to ignore even modest contributions to global warming. If global warming is the result of the cumulative contributions of myriad sources, any one modest in itself, is there not a danger of losing the forest by closing our eyes to the felling of the individual trees?', *City of Los Angeles v. NHTSA*, 912 F.2d 478, 501 (D.C.Cir.1990) (Wald, C.J., dissenting), overruled on other grounds by *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658 (D.C.Cir. 1996)." 538 F.3d at 1217. The Court held the NHTSA had to provide "the necessary contextual information about the cumulative and incremental environmental impacts of the Final Rule in light of other CAFE rulemakings and other past, present, and reasonably foreseeable future actions, regardless of what agency or person undertakes such other actions." *Id*.

This Court should not allow defendants to scrape by without doing a full analysis of the impacts of their actions on global climate change. 40 C.F.R. § 1508.7 requires agencies to analyze foreseeable impacts and defendants have not done so here.

### VIII.   Defendants Violated NEPA and the APA by Failing to Provide Adequate Notice and Public Participation

40 C.F.R. § 1506.6 requires the following:

Public involvement. Agencies shall:
(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures (§ 1507.3 of this chapter).
(b) Provide public notice of NEPA-related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions. When selecting appropriate methods for providing public notice, agencies shall consider the ability of affected persons and agencies to access electronic media.

While NEPA does not require the NGB to hold a public hearing, if an agency does hold a public hearing, "…Its decision is entitled to greater weight." *River Road Alliance, Inc. v. Corps of Engineers of U.S. Army*, 764 F.2d 445, 451 (7th Cir. 1985).

16

The NGB violated the public participation and notice requirements of NEPA and implementing regulations by failing to inform the public of its proposed action and failing to allow for meaningful and timely public involvement.

The two brief notices in the print edition of the Wisconsin State Journal on April 7 and April 21, 2019, were inadequate to provide meaningful access to neighbors of the Project. The notices stated that a draft EA was available. (PPFOF ¶ 67.) The NGB should have placed notices in community centers and in the affected neighborhoods, and notices in free publications or places. The NGB held no public hearing (PPFOF ¶ 68), but it should have held a public hearing and answered questions from low-income and minority people who live in the affected area, drink City water, and eat fish from Starkweather Creek and Lake Monona.

Therefore, the approval is arbitrary, capricious, an abuse of discretion, and not in accordance with the law under NEPA and the APA.

### IX.    Defendants Violated the Administrative Procedure Act by Taking Action that is Arbitrary and Capricious and an Abuse of Discretion

"[A] court's review of agency action under NEPA is governed by the APA. *See Indiana Forest Alliance, Inc. v. United States Forest Serv*., 325 F.3d 851, 858 (7th Cir.2003). The APA instructs courts to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Under this standard, our inquiry is "searching and careful" but "the ultimate standard of review is a narrow one." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotations and citations omitted). We only must ask "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* "If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Indiana Forest Alliance*, 325 F.3d at 859. In the context of NEPA, arbitrary and capricious review prohibits a court from "substitut[ing] its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). In fact, "[t]he only role" for a court in applying the arbitrary and capricious standard in the NEPA context "is to insure that the agency has taken a 'hard look' at environmental consequences." *Id.*

*Highway J Citizens Group v. Mineta*, 349 F.3d 938, 952-953 (7th Cir. 2003).

In this case, the NGB has made a clear error of judgment and failed to take a hard look at the environmental consequences of the Project. The actions of the NGB as described above are arbitrary, capricious, and an abuse of discretion; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; unsupported by substantial evidence; and unwarranted by the facts. 5 U.S.C. § 706(2)(A), (C), (D), (E), (F).

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court grant summary judgment in its favor and find that Defendants violated NEPA and the APA.

Dated this 14th day of June, 2021.

<div style="margin-left: 40%;">

s/ Kathleen G. Henry
Kathleen G. Henry (WI Bar No. 1118591)
Dairyland Public Interest Law
PO Box 352
Madison, WI 53701
(608) 213-6857
khenry@dairylandpublicinterestlaw.com

*Attorneys for Plaintiff*

</div>