IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SAFE SKIES CLEAN WATER
WISCONSIN, INC.,

                    Plaintiff,

          v.                                        Case No. 3:20-cv-1086-wmc

NATIONAL GUARD BUREAU, *et al.*,

                    Defendants.

**DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

LEGAL BACKGROUND ............................................................................................. 3

STATEMENT OF FACTS ............................................................................................ 4

STANDARD OF REVIEW .......................................................................................... 7

ARGUMENT ................................................................................................................ 8

I.    The Projects in the EA Were Not Improperly Segmented from the EIS Analyzing Basing F-35A Jets, as the Projects Serve a Different Purpose and Need ............................................................................................................... 8

II.    The National Guard Thoroughly Examined the Effects of the Projects and Reasonably Concluded that Preparation of an EIS was Not Necessary .............. 11

    A.    The NGB Took a "Hard Look" at the Environmental Effects of the Projects ................................................................................................. 12

        1. The NGB Considered the Possible Release of PFAS as a Result of the Projects in the EA but Determined that Mitigation Steps Would Ensure No Adverse Environmental Effects ...................... 12

        2.    The NGB Thoroughly Considered Environmental Justice Impacts and Reasonably Determined that Use of MMPs Would Alleviate Any Impact on the Community Residing Near Truax Field ........................................................................ 17

        3.    Plaintiff's Claim that the NGB Failed to Consider Climate Change is Unsupported by the Record .......................................... 20

        4.    The NGB Thoroughly Considered a Range of Cumulative Impacts ........................................................................................ 22

    B.    The Construction Activities Did Not Require Preparation of an Environmental Impact Statement ................................................................ 24

III.    The National Guard Was Not Required to Complete a Supplemental Environmental Assessment ................................................................................. 26

IV.    The National Guard Properly Considered Alternatives ........................................ 27

VI.    Public Notice and Outreach Was Sufficient ....................................................... 31

VII.   The Court Should Disregard Plaintiff's Submission of Extra-Record
       Declarations and Exhibits ................................................................................ 32

CONCLUSION ............................................................................................................... 33

# TABLE OF AUTHORITIES

**Cases**

*Califano v. Sanders*,
430 U.S. 99 (1977)............................................................................................ 12

*Camp v. Pitts*,
411 U.S. 138 (1973).......................................................................................... 32

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971).......................................................................................... 7

*City of Evanston v. Reg'l Transp. Auth.*,
825 F.2d 1121 (7th Cir. 1987) ........................................................................ 24

*City of W. Chic. v. U.S. Nuclear Regul.Comm'n*,
701 F.2d 632 (7th Cir. 1983) .......................................................................... 9

*Coliseum Square Ass'n v. Jackson*,
465 F.3d 215 (5th Cir. 2006) .......................................................................... 25

*Cronin v. USDA*,
919 F.2d 439 (7th Cir. 1990) .......................................................................... 32

*Ctr.for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) .................................................................. 26, 27

*DOT v. Pub. Citizen*,
541 U.S. 752 (2004).......................................................................................... 28

*Habitat Educ. Ctr., Inc. v. Bosworth*,
381 F. Supp. 2d 842 (E.D. Wis. 2005)............................................................ 33

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*,
593 F. Supp. 2d 1019 (E.D. Wis. 2009)..................................................... 19, 30

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*,
673 F.3d 518 (7th Cir. 2012) .......................................................................... 23

*Heartwood, Inc. v. U.S. Forest Serv.*,
230 F.3d 947 (7th Cir. 2000) .......................................................................... 12

*Highway J Citizens Grp. U.A. v. U.S. DOT*,
656 F. Supp. 2d 868 (E.D. Wis. 2009)............................................................ 8

*Highway J Citizens Grp. v. Mineta*,
349 F.3d 938 (7th Cir. 2003) ................................. 3, 7, 9, 11, 12, 16, 17, 25, 26, 27, 28, 32

*Hillsdale Env't. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
702 F.3d 1156 (10th Cir. 2012) ...................................................................... 26

*Ind. Forest All., Inc. v. U.S. Forest Serv.*,
325 F.3d 851 (7th Cir. 2003) ..................................................................... 23, 24

iv

*Kleppe v. Sierra Club*,
　427 U.S. 390 (1976) ........................................................................ 11

*Marsh v. Or. Nat. Res. Council*,
　490 U.S. 360 (1989) ....................................................... 7, 8, 12, 26

*Miami Nation of Indians of Ind., Inc. v. Babbitt*,
　55 F. Supp. 2d 921 (N.D. Ind. 1999) ............................................ 33

*Native Ecosystems Council v. U.S. Forest Serv.*,
　428 F.3d 1233 (9th Cir. 2005) ....................................................... 30

*Native Vill. of Nuiqsut v. BLM*,
　432 F. Supp. 3d 1003 (D. Alaska 2020) ................................... 30, 31

*Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*,
　195 F.3d 975 (7th Cir. 1999) ........................................................ 32

*Rhodes v. Johnson*,
　153 F.3d 785 (7th Cir. 1998) .......................................................... 4

*River Rd. All., Inc. v. Corps of Eng'rs of U.S. Army*,
　764 F.2d 445 (7th Cir. 1985) ............................................. 3, 12, 28

*Riverkeeper Network v. FERC*,
　753 F.3d 1304 (D.C. Cir. 2014) ...................................................... 7

*Robertson v. Methow Valley Citizens Council*,
　490 U.S. 332 (1989) ................................................................. 3, 12

*Sauk Prairie Conservation All. v. U.S. DOI*,
　944 F.3d 664 (7th Cir. 2019) ........................................................ 25

*Save Barton Creek Ass'n v. Fed. Highway Admin.*,
　950 F.2d 1129 (5th Cir. 1992) ........................................................ 9

*Sierra Club v. FERC*,
　867 F.3d 1357 (D.C. Cir. 2017) ............................................... 19, 20

*Sokaogon Chippewa Cmty. v. Babbitt*,
　929 F. Supp. 1165 (W.D. Wis. 1996) ........................................... 33

*Swain v. Brinegar*,
　542 F.2d 364 (7th Cir. 1976) .......................................................... 9

*WildEarth Guardians v. BLM*,
　8 F. Supp. 3d 17 (D.D.C. 2014) .................................................... 21

*WildEarth Guardians v. Jewell*,
　738 F.3d 298 (D.C. Cir. 2013) ...................................................... 21

**Statutes**

5 U.S.C. § 706(2)(A) ......................................................................... 7

5 U.S.C. §§ 701–706 ................................................................................... 7

10 U.S.C. § 2707 ...................................................................................... 16

42 U.S.C. § 4332(C) ................................................................................. 3

**Regulations**

32 C.F.R. § 989.18 .................................................................................. 19

32 C.F.R. § 989.24 .................................................................................. 19

32 C.F.R. § 989.24(a) .............................................................................. 31

32 C.F.R. § 989.24(c) .............................................................................. 32

32 C.F.R. § 989.33 .................................................................................. 17

32 C.F.R. § 989.8(a) ................................................................................ 29

40 C.F.R. § 1506.6(a) .............................................................................. 31

40 C.F.R. § 1506.6(b)(3) ..................................................................... 31, 32

40 C.F.R. § 1508.27 ........................................................................... 25, 26

40 C.F.R. § 1508.9(a)(1) ............................................................................ 3

40 C.F.R. § 1508.9(b) ................................................................................ 4

40 C.F.R. pt. 1500 ..................................................................................... 3

43 Fed. Reg. 55978 (Nov. 29, 1978) .......................................................... 3

51 Fed. Reg. 15618 (Apr. 25, 1986) ........................................................... 3

52 Fed. Reg. 2923 (Jan. 23, 1987) ........................................................... 16

84 Fed. Reg. 39,296 (Aug. 9, 2019) ............................................................ 7

85 Fed. Reg. 11,986 (Feb. 28, 2020 .......................................................... 13

## INTRODUCTION

The National Guard Bureau's ("NGB") 115th Fighter Wing ("115 FW") is responsible for providing properly trained and equipped flying units to support both federal and state missions. In order to allow the 115 FW to fulfill those missions, the NGB must provide appropriate facilities so that the 115 FW can safely, efficiently, and effectively carry out its duties. The NGB determined that it needed to upgrade a number of facilities at Truax Field, which houses the 115 FW at Dane County Regional Airport in Madison, Wisconsin, and prepared an Environmental Assessment ("EA") to evaluate the environmental effects of 27 discrete construction, demolition, and renovation projects (the "Projects"). Along with the final EA the NGB issued a Finding of No Significant Impact ("FONSI") summarizing its conclusion that the Projects would not have a significant effect on the environment.

Plaintiff Safe Skies Clean Air Wisconsin, Inc. challenges preparation of the EA as violating the National Environmental Policy Act ("NEPA"). Plaintiff bases its challenge on two primary arguments: 1) that the NGB overlooked or improperly minimized the harmful effects that would result from the Projects disturbing soil and groundwater that were previously contaminated with certain "per- and polyfluoroalkyl substances" (referred to throughout as "PFAS")[1]; and 2) that, in the final EA, the NGB improperly failed to consider the effects of basing F-35A aircraft at Truax Field (a decision that is evaluated in a separate Environmental

---

[1]     "PFAS refers to a large group of man-made chemicals that include PFOA [perflourooctanic acid], PFOS [perfluorooctane sulfonate], GenX, and thousands of other chemicals." Defendants' Prop. Findings of Fact ("Defs.' PFF") ¶ 30, Bates No. 1, SCW_68. "PFOA and PFOS have been the most extensively studied and are currently the only two PFAS chemicals for which the [U.S. EPA] has established lifetime drinking water Health Advisories for ground water … and calculated Regional Screening Levels for soil." *Id.* PFAS is present at Truax Field from historic use and storage of "Aqueous Film Forming Foam," Defs.' PFF ¶ 31, Bates No. 53, SCW_11571, which was used for fire suppression at various locations around the base. Defs.' PFF ¶ 31, Bates No. 53, SCW_11575-79.

Impact Statement ("EIS") that was prepared concurrently with the final EA at issue here) because basing those jets will utilize many of the Projects.

As described below, both primary arguments and their various iterations, fail.  First, as to PFAS, the NGB relied on the results of two detailed investigations into contamination at Truax Field, and concluded that with the application of certain mitigation measures any construction or demolition for projects taking place in areas contaminated with PFAS would not result in the dispersal of additional PFAS off of the base.  Indeed, only two of the 27 Projects will take place in areas with PFAS present, thus minimizing any potential contamination.  Second, and as described in detail by the NGB in the final EA, the Projects are necessary to allow the 115 FW to meet its current mission requirements (requirements that, at the time the NGB issued the FONSI, did not involve the basing of F-35A aircraft at Truax Field).  As such, the NGB appropriately analyzed only the environmental effects of the Projects themselves.

Moreover, Plaintiff's secondary arguments are each unavailing, and belied by the explanations and analysis provided by the NGB in the final EA.  In particular, the NGB appropriately analyzed other environmental effects of the Projects, such as emissions and environmental justice, looked at reasonable alternatives, and reasonably concluded that preparation of an EIS was not necessary given the expected environmental effects.

Finally, Plaintiff relies on three declarations, ECF Nos. 15-17, that make arguments and attach documentation outside of the administrative record ("AR") filed in this case.  *See* ECF No. 10 (notice of lodging of AR).  To the extent those declarations seek to provide extra-record evidence for the Court to consider going to the merits of Plaintiff's claims, the Court should disregard those declarations, as the Court's review under the Administrative Procedure Act

("APA") is properly confined to those documents in the AR prepared by the NGB, which was unchallenged by Plaintiff.

As such, and for the reasons discussed below, the Court should grant summary judgment to Defendants on all of Plaintiff's claims.

## LEGAL BACKGROUND

To ensure informed decisions, NEPA requires an agency to analyze and disclose significant environmental effects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). However, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, [an] agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id*; *see also id*. at 351 ("NEPA merely prohibits uninformed–rather than unwise–agency action").

In keeping with those general principles, federal agencies are required to prepare an environmental analysis for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(C). "These considerations are often spelled out in the preliminary stages of a proposed project in an [EA]." *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 954 (7th Cir. 2003). An EA is a "concise public document" providing "sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9(a)(1)[2]; *see also River Rd. All., Inc. v. Corps of Eng'rs of U.S. Army*, 764 F.2d 445, 449 (7th Cir. 1985) ("[T]he purpose of an environmental assessment is to determine whether there is

---

[2]    The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15618 (Apr. 25, 1986). More recently, CEQ published a new rule, effective September 14, 2020, further revising the 1978 regulations. The claims in this case arise under the 1978 regulations, as amended in 1986. All citations to CEQ's regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2018).

enough likelihood of significant environmental consequences to justify the time and expense of preparing an environmental impact statement."). "Thus, preparation of an EA leads either to a FONSI, or to a finding that an EIS is required, in which case additional time and expense will be incurred." *Rhodes v. Johnson*, 153 F.3d 785, 788 (7th Cir. 1998).

An EA must include brief discussions of the need for the proposal, of alternatives, of the environmental impacts of the proposed action and the alternatives, and a listing of agencies and persons consulted. 40 C.F.R. § 1508.9(b). A FONSI, in turn, is a finding that the proposed action "will not have a significant effect on the human environment" and for which an EIS is not required. *Id*. § 1508.13.

## STATEMENT OF FACTS

The 115 FW installation (Truax Field) of the Wisconsin Air National Guard ("WIANG") is located within the boundaries of Dane County Regional Airport in Madison, Wisconsin. Defs.' PFF ¶ 1, Bates No. 1, SCW_20. The 115 FW installation is approximately 155 acres in size, and has over 40 buildings/structures. Defs.' PFF ¶ 2, Bates No. 1, SCW_20.

The NGB tasks the 115 FW to carry out two distinct missions. The 115 FW's federal mission is to staff and train flying and support units to "augment Air Combat Command's general-purpose fighter forces to effectively and rapidly deliver F-16 combat power anywhere in the world for wartime or peacetime missions." Defs.' PFF ¶ 3, Bates No. 1, SCW_20. Additionally, the 115 FW provides "an Aerospace Control Alert commitment for the region under the North American Aerospace Defense Command." *Id*. The 115 FW's state mission is to provide trained and equipped units to protect life and property and to preserve peace, order, and public safety as directed by the Governor of Wisconsin. Defs.' PFF ¶ 4, Bates No. 1, SCW_20. In support of those missions the 115 FW currently operates 18 F-16 C/D aircraft and 1 RC-26B aircraft. Defs.' PFF ¶ 5, Bates No. 1, SCW_20.

4

For the 115 FW to continue to meet its mission goals, the NGB, through the Air National Guard ("ANG") must provide facilities that are properly sized and configured.  Defs.' PFF ¶ 6, Bates No. 1, SCW_19.  As part of that requirement the NGB identified that the current facilities at Truax Field did "not adequately support current or future mission requirements and/or are not adequately sized."  Defs.' PFF ¶ 7, Bates No. 1, SCW_27.

Many of the projects evaluated in the final EA were first identified in a 2012 Installation Development Plan ("IDP") which analyzed development plans and needs at Truax Field.  Defs.' PFF ¶ 8, Bates No. 61, SCW_11817; *see also id*. at Bates No. 61, SCW_11820-23 (describing recommended projects).  In particular, the IDP was intended to "outline[] a strategy to modernize facilities and maximize infrastructure to meet current mission requirements for the 115 FW" and "explains the logic and reasoning for the proposed capital improvements."  Defs.' PFF ¶ 9, Bates No. 61, SCW_11799.  Some of those same projects were discussed during a January 2016 "Facilities Board" meeting, which addressed, among other things, updates to the 115 FW IDP in the fiscal year ("FY") 2016 IDP review.  Defs.' PFF ¶ 10, Bates No. 64, SCW_12095; *see also id*. at Bates No. 64, SCW_12103-07 (list of projects); Bates No. 70 (FY2016 IDP Review), SCW_12453-58 (list of projects); Bates No. 72, SCW_127460 (IDP is used to identify "high level projects that both affect current mission and future mission objectives"); Bates No. 72, SCW_12788-92 (projects).

As a result of those reviews, as well as discussions between the NGB and the 115 FW, the NGB proposed 27 Projects to "support the current mission" by "provid[ing] adequate space needed to fulfill mission requirements," such as "consolidate[ing] job functions" and "improve[ing] workflow."  Defs.' PFF ¶ 11, Bates No. 1, SCW_27; *see also id*. at Bates No. 1, SCW_28-32 (listing projects).  The Projects were also identified as necessary to allow the 115

FW to "accomplish [its] mission in a safe and efficient manner" such as by "upgrading facilities to meet current safety and security standards."  Defs.' PFF ¶ 12, Bates No. 1, SCW_03.[3]  In particular, "[t]he proposed demolition actions would remove excess, obsolete, deteriorating, and underused facilities."  Defs.' PFF ¶ 13, Bates No. 1, SCW_19.

After internal distribution, on February 7, 2019 the NGB circulated a draft Description of Proposed Action and Alternatives ("DOPAA") to various stakeholders, including other federal and state agencies, and several federally-recognized tribes.  Defs.' PFF ¶ 20, Bates No. 1, SCW_25; *see also id*. at Bates No. 1, SCW_127-142.  The ANG received two responses to the DOPAA (one was a "no comment"), Defs.' PFF ¶ 21, Bates No. 1, SCW_137, and addressed the substantive comment in the draft EA.  *See id*. at Bates No. 63, SCW_12023-90.  Following the DOPAA circulation/scoping process, the ANG issued notice of the draft EA on both April 7, 2019 and April 21, 2019 by publishing notice in the Wisconsin State Journal, Defs.' PFF ¶ 23, Bates No. 1, SCW_157-58, and invited public comments through May 7, 2019 (with a subsequent extension of the public comment period through May 21, 2019).  Defs.' PFF ¶ 22, Bates No. 1, SCW_25; *see also id*. at Bates No. 1, SCW_143-46 (federal and state agency comments); Bates No. 1, SCW_155-75 (public comments); Bates No. 59, SCW_11728 (NGB response to comments).

---

[3]      Specifically, the new facilities would "comply with [ANG] Instruction 32-1023, *Criteria and Standards for Air National Guard Construction*, and ANG Handbook 32-1084, *Facility Space Standards*.  The construction is also necessary to replace outdated facilities and to secure assets.  New facilities would adhere to *DoD Minimum Antiterrorism Standards for Buildings, as presented in Unified Facilities Criteria* [ ] 4-010-01, effective 9 February 2012, Change 1, 01 October 2013, when required by AFI 32-1032 (September 24, 2015), *Planning and Programming Appropriated Fund Maintenance, Repair, and Construction Projects*."  Defs.' PFF ¶ 15, Bates No. 1, SCW_19.

Based on the draft EA and public comments, in the final EA the ANG concluded that the proposed action would have no significant effects on the environment.  As a result, on October 22, 2019, the ANG signed a FONSI and issued the Final EA.  Defs.' PFF ¶ 24, Bates No. 1, SCW_03-12 (FONSI); SCW_13, *et seq.* (final EA).

Also relevant to Plaintiff's claims here, at largely the same time as the ANG was preparing the EA at issue in this case the U.S. Air Force and ANG were preparing an EIS evaluating the environmental effects of basing F-35A aircraft at five sites around the country, including at Truax Field.  Defs.' PFF ¶ 25, Bates No. 1, SCW_105.  The Notice of Intent to conduct the EIS was published on February 7, 2018, 83 Fed. Reg. 5,408 (Feb. 7, 2018), the draft EIS was proposed on August 9, 2019, 84 Fed. Reg. 39,296 (Aug. 9, 2019), and, after receiving and responding to comments from the public, the EIS was finalized on February 28, 2020.  85 Fed. Reg. 11,986 (Feb. 28, 2020).  That EIS is the subject of a separate lawsuit brought by plaintiff in the U.S. District Court for the District of Columbia.  *Safe Skies Clean Water Wisconsin, Inc. v. U.S. Air Force*, No. 21-634 (D.D.C.) (J. Kollar-Kotelly).  Merits briefing in that lawsuit is expected to commence this fall.  Defs.' PFF ¶ 26.

## STANDARD OF REVIEW

The APA, 5 U.S.C. §§ 701–706, directs courts to uphold an agency's decision unless it is deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Under the APA, a court's role is only to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)); *see also Mineta*, 349 F.3d at 953.  In other words, "[c]ourts may not use their review of an agency's environmental analysis to second-guess substantive decisions committed to the discretion of the agency."  *Del. Riverkeeper*

*Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014).  Similarly, "[i]n making its pragmatic

judgment, a court must [] be careful not to 'flyspeck' an agency's environmental analysis,

looking for any deficiency, no matter how minor."  *Highway J Citizens Grp. U.A. v. U.S. DOT*,

656 F. Supp. 2d 868, 885 (E.D. Wis. 2009) (citation omitted).  And an agency's determinations

within its technical expertise are entitled to deference.  *See, e.g., Marsh*, 490 U.S. at 377.

## ARGUMENT

Plaintiff brings a number of challenges, largely centered on:  1) its belief that the NGB

improperly segmented the Projects in the final EA from the EIS assessing the effects of

potentially basing F-35 aircraft at Truax Field; and 2) its claim that the final EA failed to

thoroughly analyze the potential disturbance of PFAS-contaminated soil and groundwater.  As an

initial matter, the Projects in the final EA are intended to serve the 115 FW's current mission, not

future basing of aircraft.  And the NGB properly considered various effects of the Projects,

including release of PFAS, emissions, and environmental justice, in determining preparation of

an EIS was not required, and appropriately analyzed alternatives.  Further, extra-record

information referenced by Plaintiff does not merit preparation of a supplemental EA.  Finally, the

NGB provided public notice of the draft EA and solicited comments in keeping with NEPA's

requirements.

**I.      The Projects in the EA Were Not Improperly Segmented from the EIS Analyzing Basing F-35A Jets, as the Projects Serve a Different Purpose and Need.**

Plaintiff's argument that the NGB improperly segmented its analysis of the Projects from

the EIS assessing the possible introduction of the F-35A aircraft to Truax Field ignores that the

Projects support a mission independent from the proposed F-35A Operation Beddown.

"Piecemealing or segmentation … allows an agency to avoid the NEPA requirement that

an EIS be prepared for all major federal action with significant environmental impacts by

segmenting an overall plan into smaller parts involving action with less significant environmental effects." *City of W. Chic. v. U.S. Nuclear Regul. Comm'n*, 701 F.2d 632, 650 (7th Cir. 1983).  "The purpose of segmentation review is not for a court to decide whether or not an agency drew the correct lines when putting the boundaries on its projects.  Rather, '[s]egmentation analysis functions to weed out projects which are pretextually segmented, and for which there is no independent reason to exist.  When the segmentation project has no independent justification, no life of its own, or is simply illogical when viewed in isolation, the segmentation will be held invalid.'"  *Mineta*, 349 F.3d at 962 (quoting *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1139 (5th Cir. 1992)).  In other words, a court should take a "pragmatic and realistic look to see whether the proposed action has an "independent utility of its own"; if so, the action is properly analyzed separately.  *Swain v. Brinegar*, 542 F.2d 364, 369 (7th Cir. 1976) (citation omitted).

Here, Plaintiff alleges that "[t]he NGB improperly segmented [the EA Projects] from the F-35 Operational Beddown Project, because the purpose of this project is to prepare for the F-35s to be brought to Madison."  Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") at 11 (ECF No. 14).  As a result, Plaintiff claims that "[t]he EA does not look at the totality of the impacts of increased PFAS emissions from land disturbance and creation of impervious surfaces and their potential impact on groundwater and drinking water."  *Id.*  But, as described below, the record makes clear that the NGB pursued the Projects to enable the 115 FW to meet its current mission requirements, rather than to prepare Truax Field for the potential arrival of F-35A aircraft.

In particular, the NGB explained that the Projects are independently necessary to the continued operations and mission of the 115 FW, not deployment of new aircraft.  The final EA stated that the Projects:

> "[P]rovide the facilities and training opportunities necessary to ensure that the 115 FW can accomplish their mission in a safe and efficient manner. For the 115 FW to continue to meet their mission goals, the NGB needs to provide facilities that are properly sized and configured to meet the demands of the continuously evolving mission of the 115 FW. The proposed construction and renovation projects will improve mission efficiency by improving base access and utilities, consolidating mission functions, and upgrading facilities to meet current safety and security standards. The proposed demolition actions will remove excess, obsolete, deteriorating, and underused facilities."

Defs.' PFF ¶ 12, Bates No. 1, SCW_03; *see also id.* ("The construction is also necessary to replace outdated facilities and to secure assets."). Further, the NGB noted that "[m]any of these facilities do not adequately support *current* or future mission requirements and/or are not adequately sized. Under the Proposed Action, the 115 FW will implement 27 infrastructure improvement projects, including the demolition of 7 facilities, in order to support the *current* mission [ ]." Defs.' PFF ¶ 14, Bates No. 1, SCW_04 (emphasis added); *see also id.* at Bates No. 1, SCW_19 ("The proposed construction and renovation projects would improve mission efficiency by improving base access and utilities, consolidating mission functions, and upgrading facilities to meet *current* safety and security standards. The proposed demolition actions would remove excess, obsolete, deteriorating, and underused facilities.") (emphasis added); *id.* at Bates No. 1, SCW_27 (the "[t]wenty-seven infrastructure improvement projects" in the EA were needed "to support the current mission. These improvement projects would provide adequate space needed to fulfill mission requirements and would consolidate job functions and improve workflow."). As such, regardless of whether F-35As are deployed at Traux field, the NGB would move forward with the Projects.

Similarly, in the NGB's consideration of comments matrix, it explained, in response to questions as to the relationship of the EA projects to basing of the F-35A, that the EA "projects are related to the current mission and are independent of the F-35 EIS basing decision." Defs.'

PFF ¶ 14, Bates No. 59, SCW_11728.  And the record shows that planning for the projects in the EA began long before Truax Field was identified as a final choice for deployment of the F-35As on February 28, 2020 (and ultimately selected as one of the two locations for deployment of the F-35As in a Record of Decision signed on April 14, 2020).  In particular, many of the projects evaluated in the EA were first identified in the 2012 IDP.  Defs.' PFF ¶ 8, Bates No. 61, SCW_11817; *see also id*. at Bates No. 61, SCW_11820-23 (describing recommended projects).  And some Projects were also addressed in a 2016 Facilities Board Meeting, Defs.' PFF ¶ 10, Bates No. 64, SCW12104-07 (list of projects); *see also id*. at Bates No. 72, SCW_12788-92.

In sum, the NGB was clear and consistent throughout the EA that the purpose of the projects was to meet *current* mission requirements, not to accommodate the proposed F-35A Operation Beddown analyzed in the separate EIS.  That "reasoned conclusion" is therefore entitled to deference.  *Mineta*, 349 F.3d at 963.

## II.  The National Guard Thoroughly Examined the Effects of the Projects and Reasonably Concluded that Preparation of an EIS was Not Necessary.

After preparing a 125-page EA and thoroughly considering the Projects' likely environmental effects, the NGB found that the Projects would have no significant effect on the environment.  Plaintiff nonetheless argues that NGB failed to take a hard look at the Projects' impacts, and that an EIS was required.  But Plaintiff's arguments consistently ignore the robust record in this case.

"[I]n applying the arbitrary and capricious standard in the NEPA context" a court must simply "ensure that the agency has taken a hard look at environmental consequences."  *Mineta*, 349 F.3d at 953 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  That "hard look" standard is designed to ensure that "in reaching its decision, [an agency] will have available, and will carefully consider, detailed information concerning significant environmental impacts" such

11

that "adverse environmental effects of the proposed action are adequately identified and evaluated." *Methow Valley*, 490 U.S. at 349-50. But NEPA "does not mandate particular results"; it "simply prescribes the necessary process." *Id*. at 350.

Further, after analyzing the environmental impacts of a proposed action, an agency must determine whether the action "significantly" affects the environment and therefore merits preparation of an EIS. *See Mineta*, 349 F.3d at 957 (citing 42 U.S.C. § 4332(2)(c)); *see also River Rd. All., Inc.*, 764 F.2d at 449 (the purpose of an EA "is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an environmental impact statement."). As with the "hard look" standard, a court looks only to see whether an agency made an "informed and reasoned" determination that no EIS was required. *Mineta*, 349 F.3d at 957 (citing *Marsh*, 490 U.S. at 378).

Here, and as described below, the NGB took an appropriately "hard look" at the various effects of the Projects in the EA, including the release of PFAS, emissions, environmental justice, and climate change. As a result, the NGB rationally concluded that the environmental effects did not rise to the level where preparation of an EIS was necessary.[4]

### A.      The NGB Took a "Hard Look" at the Environmental Effects of the Projects.

### 1.      The NGB Considered the Possible Release of PFAS as a Result of the Projects in the EA but Determined that Mitigation Steps Would Ensure No Adverse Environmental Effects.

Plaintiff brings a variety of claims arguing that the NGB failed to take a hard look at the effects of the construction on the potential spread of PFAS into soil and water that would then

---

[4]      Plaintiff also brings a claim directly under the APA. Pl.'s Mem. 18. But the APA provides the standard of review for claims brought under NEPA, *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947, 953 (7th Cir. 2000), rather than an independent cause of action. *See Califano v. Sanders*, 430 U.S. 99, 107 (1977) ("the APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action.").

flow off of Truax Field and into adjacent neighborhoods in Madison.  In particular, Plaintiff

alleges that the NGB:  1) did not sufficiently analyze "the effects of the construction and land

disturbance on the soil and water and potential releases of hazardous substances," Pl.'s Mem. 8,

and consequently did not "consider the effects of the construction of the Project[s] on the PFAS

levels that would leave [Truax Field] either by soil or groundwater contamination," *id*. at 9; and

2) "failed to comply with the request to clean up PFAS and therefore cannot possibly have

studied the effects of increased PFAS on human health, fish consumption, pollution of

groundwater and drinking wells," *id*.[5]  As described below, the record facially belies each of

those contentions.

First, NGB did consider the impacts of construction on the potential release of PFAS and

concluded that with implementation of proper mitigation measures there would be no such

releases.  Specifically, and as discussed below, the NGB based its conclusions as to PFAS on

two investigative reports.  Those investigations identified the potential locations where PFAS

release occurred, and then conducted a more detailed study at those locations to determine

whether remediation was necessary.

In December 2015, the NGB received the results of a "Preliminary Assessment" ("PA").

*See* Defs.' PFF ¶ 32, Bates No. 53, SCW_11563.  The PA was intended to "identify potential

locations of historic releases of Aqueous Film Forming Foam [] from usage and storage" to

"determine if a site posed a potential threat to human health and the environment and required

---

[5]     Plaintiff also claims that the "NGB is not studying the PFAS that are known to be
polluting the Base and the extent that the PFAS are traveling off the Base."  *Id*. at 13.  As
described in detail below, that allegation is simply belied by the record, which indicates the NGB
is engaged in ongoing study of PFAS, including a forthcoming Remedial Investigation into
PFAS contamination at Truax Field.  *See* Defs.' PFF ¶ 39, Bates No. 1, SCW_68.

additional inspection.  Defs.' PFF ¶ 33, Bates No. 17, SCW_1960.  The PA concluded, in part, that:

> "[t]en potential release sites have been identified at the WIANG Base …. Of those ten sites, nine are recommended for further investigation.  Further investigation is recommended at the Base to monitor and characterize any groundwater, soil, sediment, and/or surface water [ ] contamination onsite.  Sampling of soil and groundwater within the Base and at the outfalls of Starkweather Creek is recommended at a minimum to evaluate the potential of migration of [PFAS].  In addition, verification of the structural integrity of the Base sanitary sewer is advised."

Defs.' PFF ¶ 34, Bates No. 53, SCW_11583; *see also id.* at Bates No. 53, SCW_11584-85 (summarizing conclusions as to each of nine sites); Bates No. 1, SCW_68 ("[a] Preliminary Assessment site visit was conducted in 2015 to identify possible [PFAS] contaminated potential release locations [ ].").

The NGB then commissioned a more detailed site inspection ("SI"), which was completed on April 1, 2019.  Defs.' PFF ¶ 35, Bates No. 17, SCW_1941, *et seq*.  The SI included groundwater and soil sampling to test for the "presence/absence" of PFAS to determine whether "remedial investigation" is necessary.  Defs.' PFF ¶ 36-37, Bates No. 17, SCW_1961, SCW_1980.  That sampling confirmed the presence of PFAS at each of the nine potential release locations ("PRLs").  Defs.' PFF ¶ 38, Bates No. 17, SCW_1957; *see also id*. at Bates No. 17, SCW_1958 (summarizing conclusions as to each site); *id*. at Bates No. 17, SCW_1998.  As a result, the SI recommended additional investigation into PFAS concentrations in groundwater at all nine PRLs, and additional investigation at two PRLs to determine concentrations in soil and any potential for release.  Defs.' PFF ¶ 39, Bates No. 17, SCW_2003-04 _2004; Bates No. 1, SCW_ 68 ("A site inspection was conducted to follow-up on the PLRs identified in 2015, and indicated that three of the nine PRLs are locations where construction is planned to occur); *id*. at Bates No. 1, SCW_69-71 (identifying and describing locations in more detail).

14

Based on those findings, in the final EA the NGB concluded that:

"a Media Management Plan [("MMP")] is recommended for two project areas. If any contaminated media (e.g., soil, groundwater) were encountered during the course of site preparation (e.g., clearing, grading) or site development (e.g., excavation for installation of building footers) for any of the projects under the Proposed Action, samples will be collected to determine whether the media are contaminated, and contaminated media will be segregated for off-site disposal or for on-site reuse as appropriate."

Defs.' PFF ¶ 40, Bates No. 1, SCW_11[6]; *see also id.* at Bates No. 1, SCW_101 ("Soil and groundwater disturbance is expected to occur during demolition and construction of the addition. The 115 FW would evaluate all investigative findings up to the initiation of construction activities and develop a [MMP] to identify, contain, and properly dispose of [PFAS] above Federal and/or State regulatory limits in soil and groundwater."). The MMP "could include media sampling protocol in accordance with the [SI] or Remedial Investigation Work Plans, media characterization, erosion control [ ], and media disposal requirements based on current State and Federal guidelines on [PFAS]." Defs.' PFF ¶ 41, SCW_101-02; *see also id.* at Bates No. 1, SCW_103 ("[t]he [MMP] should detail the procedure for soil and groundwater sampling … and procedures for encountering of contaminated media, site erosion controls, media disposal, and federal and state agency notification in accordance with current regulatory requirements at the time of construction.").

In addition, in response to comments from the Wisconsin Department of Natural Resources the NGB noted that it would be preparing a Remedial Investigation of the sites identified in the SI. Defs.' PFF ¶ 42, Bates No. 59, SCW_11743. The NGB also indicated that

---

[6]     Those two projects are Projects Nos. 15 and 19. Defs.' PFF ¶ 44, Bates No. 59, SCW_11743. Project No. 15 is construction of a new "boundary fence," *id.* at Bates No. 1, SCW_06, and Project No. 19 is construction of a "Fire Department Crash Truck Bay." *Id.* at Bates No. 1, SCW_07.

the final EA would reiterate the use of MMPs, and clarified the two projects that would potentially encounter PFAS contamination. *Id*. And the NGB reiterated that although construction taking place in the PRLs would be unlikely to disturb groundwater due to the depth of construction, MMPs would be used to address contaminated soil and any potential runoff to ensure no contamination occurred off of Truax Field. *Id*.

Given that plan of action, the NGB reasonably concluded in the final EA that "[w]ith proper media management no *further* contamination or migration of PFOS or PFOA from the soil or groundwater would be expected to occur." Defs.' PFF ¶ 45, Bates No. 1, SCW_ 102 (emphasis added).[7] Indeed, for construction of the boundary fence (Project No. 15), "[t]he groundwater in this area is located at 7 to 8 feet below ground surface. The fence construction will not reach this depth therefore no impact to groundwater is expected to occur." Defs.' PFF ¶ 46, Bates No. 1, SCW_102; *see also id.* at Bates No. 59, SCW_11730 (summarizing PFAS response).

As such, Plaintiff is mistaken that the NGB failed to appropriately examine the effects of the construction on potential PFAS contamination or failed to study PFAS contamination at Truax Field. Instead, the NGB relied on the results of two detailed investigations, and proposed

---

[7]     In a number of locations Plaintiff appears to challenge whether the NGB has a duty to remedy any existing PFAS contamination. *See* Pl.'s Mem. at 9. But the EA only analyzes the changes that may result from the Projects, not whether the NGB has any other legal obligations regarding existing PFAS at Truax Field. *See Mineta*, 349 F.3d at 954 n.3 ("If an agency's project does not *itself* 'significantly' affect the environment, then neither NEPA nor its implementing regulations require an agency to perform an EIS or to remedy a preexisting environmental problem merely because the project happens to take place in the vicinity of that preexisting environmental problem."). Said differently, Plaintiff's claims do not relate to the NGB's environmental restoration requirements, 10 U.S.C. § 2707, or the Department of Defense's obligations under, or authority to implement, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). *See* Executive Order 12580, 52 Fed. Reg. 2923 (Jan. 23, 1987).

that construction be performed under a plan for managing, mitigating, and preventing any release of PFAS in the specific PRLs disturbed by the two projects at issue. That analysis satisfies NEPA's hard look standard. *See Mineta*, 349 F.3d at 956 (agency satisfied NEPA's "hard look" standard in examining possible contamination as a result of digging bridge pilings by analyzing soil into which pilings would be driven).

Second, Plaintiffs' argument that NGB "failed to comply with the request to clean up PFAS and therefore cannot possibly have studied the effects of increased PFAS" is equally misplaced. As noted above, the NGB thoroughly analyzed the impact of the Projects on the potential release of PFAS. And the "request to clean up PFAS" does not relate to the NGB's obligations under NEPA as it relates to the Projects. *See* page 16 n.7 above. And, in any event, the NGB is engaged in an ongoing investigation into remediating existing PFAS contamination. Defs.' PFF ¶ 39, Bates No. 1, SCW_68.

### 2. The NGB Thoroughly Considered Environmental Justice Impacts and Reasonably Determined that Use of MMPs Would Alleviate Any Impact on the Community Residing Near Truax Field.

In the final EA the NGB found that the Projects would not have a significant effect on environmental justice because application of appropriate mitigation measures would ensure that the Projects did not cause PFAS contamination that would impact communities adjacent to Truax Field. Plaintiff takes issue with that conclusion, but its arguments are based on speculation rather than the record.

32 C.F.R. § 989.33 provides that in evaluating the environmental impacts of a project an agency should "ensure compliance with the provisions of E.O. 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations …." Executive Order 12898 provides, in turn, that "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate,

disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."  59 Fed. Reg. 7629 (Feb. 16, 1994); *see also id*. at § 2-2 ("Each Federal agency shall conduct its programs, policies, and activities that substantially affect human health or the environment, in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) to discrimination under, such programs, policies, and activities, because of their race, color, or national origin.").

Plaintiff claims NGB did not take a hard look at environmental justice impacts because it "never implemented a detailed community outreach strategy aimed at gaining local input from all communities that would be affected and did not specify targeted activities to reach low income and/or minority communities."  Pl.'s Mem. 13-14.  In particular, Plaintiff challenges the NGB's statement that PFAS disturbed during construction will not migrate off-base, noting that "NGB has not completed the investigation recommended in the 2019 Report to determine the extent to which PFAS are migrating off-base."  *Id*. at 14.  As a result, plaintiff claims that "the pollutants will have a disproportionate impact on low-income and minority populations who live near the Base, drink from the City water, fish in Starkweather Creek for subsistence fishing, and live and recreate near the contaminated soil."  *Id*.

But Plaintiff's argument is, at base, simple disagreement with the NGB's conclusion in the final EA that the projects will not disproportionately impact minority or low-income populations in the areas surrounding Truax Field.  Defs.' PFF ¶ 47, Bates No. 1, SCW_62-63; Bates No. 1, SCW_11.  In particular, the NGB noted that "contamination within Starkweather Creek is not expected to increase due to construction" because "excavated soil and/or

groundwater would be properly disposed of" and "[t]he two [Projects] within the footprint of [the PFAS PRLs] would include the development of a [MMP] if contamination is still present above federal and/or state regulatory limits at the time of construction."  Defs.' PFF ¶ 48, Bates No. 1, SCW_94.  That explanation meets NEPA's requirements.  *See Sierra Club v. FERC*, 867 F.3d 1357, 1370 (D.C. Cir. 2017) ("The goal of an environmental-justice analysis is satisfied if an agency recognizes and discusses a impacts on predominantly-minority communities.").  This is particularly because the analysis of PFAS and the potential success of MMPs is a matter within the agency's technical expertise and therefore entitled to deference.  *See Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 593 F. Supp. 2d 1019, 1025 (E.D. Wis. 2009).

And to the extent that Plaintiff believes that the NGB was required to wait for the results of the Remedial Investigation before finalizing the EA, Plaintiff fails to specify what additional information it believes the NGB is lacking, or how that information makes the NGB's current understanding of the PFAS issue so unreasonable that it was required to wait for the results of the Remedial Investigation to proceed.   Finally, to the extent that Plaintiff complains that NGB "never implemented a detailed community outreach strategy," that argument, too, is misplaced because the NGB's determination (after a detailed investigation) that the Projects would not have a disproportionate impact rendered any such additional outreach efforts unnecessary.[8]

---

[8]     In addition, the ANG's NEPA regulations provide that a "public scoping process," which includes "communicating with individual citizens, neighborhood, [and the] community," 32 C.F.R. § 989.18, is only potentially required "[i]f the proposed action would have a disproportionately high and adverse environmental effect on minority populations and low-income populations."  32 C.F.R. 989.15(e)(2)(vi); *see also* 32.C.F.R. 989.14(l) (noting that where an action may have significant effect the agency must use either the public scoping process or provide public notice).  Here, the NGB appropriately determined that no public scoping was necessary given its determination the Projects would not have a disproportionate adverse effect on minority and low-income populations.  And, in any event, the NGB complied with the public notice procedures in 32 C.F.R. § 989.24, satisfying its obligation in § 989.14(l).

In sum, the NGB's conclusion regarding environmental justice is reasonable and supported by the details of its investigations into PFAS detailed in the AR.  *See* pages 11-15 above.  The NGB rationally concluded that the Projects would not have a disproportionate effect on environmental justice communities due to the low risk that any PFAS disturbed during construction and demolition would migrate off Truax Field.  *See Sierra Club*, 867 F.3d at 1369 (upholding environmental-justice analysis when agency concluded, in part, that "the project would not have a high and adverse impact on any population, meaning, in the agency's view, that it could not have a 'disproportionately high and adverse' impact on any population, marginalized or otherwise").

### 3. Plaintiff's Claim that the NGB Failed to Consider Climate Change is Unsupported by the Record.

Plaintiff alleges the NGB failed to adequately consider climate change because it:  1) underestimated the emissions caused by construction of the projects in the EA; 2) noted only that greenhouse gas emissions will "contribute incrementally" to climate change; and 3) failed to include emissions caused by basing F-35As at Truax Field.  Pl.'s Mem. 15.  All three arguments are belied by the record in this case.

As to the first argument, Plaintiff offers no record support to buttress its belief that the NGB underestimated emissions.  Instead, the EA estimates emissions from construction of the Projects in a number of places.  Defs.' PFF ¶ 49, Bates No. 1, SCW_76-77 (construction emissions), *id*. at Bates No. 1, SCW_78 (greenhouse gas emissions).  In particular, the EA explained that:

> "[t]he proposed construction activities would contribute directly to GHG emissions from fossil fuels.  Demolition and construction activities would generate 3,405 tons of $CO_2e$ emissions in 2020.  To put these emissions in perspective, 3,405 tons of GHGs is the equivalent of 665 cars driving the national average of 11,500 miles per year … [t]hese GHG emissions would only be generated during the construction period.  The operation of new facilities may result in a small increase in installation-

> related GHG emissions, primarily through the consumption of electricity and possibly through the combustion of fossil fuel on-site if any oil or natural gas boilers or other heating units are installed in the new facilities."

Defs.' PFF ¶ 50, Bates No. 1, SCW_78.  Plaintiff does not indicate why it believes those estimates are mistaken, and fails to point to contrary data.  Indeed, the emissions estimates in the final EA were calculated using the Air Force's Air Conformity Applicability Model, which utilizes the Environmental Protection Agency's air quality thresholds.  Defs.' PFF ¶ 49, Bates No. 1, SCW_179-80.  And emissions estimates are a matter entrusted to the agency's expertise, and therefore entitled to deference.  *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 323 (D.C. Cir. 2013) (noting that emissions calculations are one of "an almost endless series of judgment calls" "vested in [] agencies, not the courts").

As to Plaintiff's second complaint, it is correct that the NGB explained that "the GHG emissions generated from the construction activities and building operations alone would not be enough to cause global warming, in combination with past and future emissions from all other sources they would contribute incrementally to the global warming that produces the adverse effects of climate change."  Defs.' PFF ¶ 51, Bates No. 1, SCW_78.  But a precise estimate of impacts on climate change is not necessary to meet the requirements of NEPA.  *See WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17, 35 (D.D.C. 2014) ("In plaintiffs' view, 'estimates [of GHG emissions] alone without an analysis of the impacts to climate resulting from these emission levels do not comply with NEPA's hard look requirement' … [b]ut it is precisely because current climate science is uncertain (and does not allow for specific linkage between particular GHG emissions and particular climate impacts) that evaluating GHG emissions … is a permissible and adequate approach.").  Instead, the NGB reasonably noted the emissions estimated as a result of

the projects in the EA, and acknowledged that those emissions would contribute to climate change.

Third, and as discussed above, while the EA focused on the effects of the Projects, the final EA did analyze emissions from basing F-35A aircraft. Defs.' PFF ¶ 28, Bates No. 1, SCW_108-109 (greenhouse gas emissions). Indeed, the NGB stated that "[t]he total [emissions] for F-35A construction projects and construction projects evaluated in this EA would be 4,136 [tons of $CO_2$], which is the equivalent of 808 cars each driving the national average of 11,500 miles per year." Defs.' PFF ¶ 29, Bates No. 1, SCW_108-09. As such, Plaintiff's allegation is once again belied by the record.[9]

### 4.   The NGB Thoroughly Considered a Range of Cumulative Impacts.

Finally, Plaintiff alleges that the NGB did not consider cumulative impacts because "adverse health impacts *could* include increased PFAS emissions in Starkweather Creek, Lake Monona, public drinking water systems, in fish consumed by the public; and in climate-change causing pollutants released from the construction, and in the deafening noise and air and water pollutants from the F-35s." Pl.'s Mem. 12 (emphasis added). As an initial matter, Plaintiff does not appear to contend that the NGB failed to consider cumulative impacts; instead, it seems to

---

[9]   Plaintiff also alleges that the NGB ignored the "deafening noise and air and water pollutants from the F-35s." Pl.'s Mem. at 12. Once again, the NGB appropriately did not consider effects caused by deployment of the F-35As, as those effects are analyzed in the separate EIS related to that action. *See* pages 8-10, above. Regardless, the NGB noted that, although it would not study those effects in detail in the final EA at issue here, "[i]mpacts to land use due to noise under the proposed USAF F-35A Air National Guard Operational Beddown would be significant." Defs.' PFF ¶ 27, Bates No. 1, SCW_109. And as to emissions from basing F-35As, the NGB explained that "[t]he replacement of the F-16 with the F-35A would result in an increase in long-term emissions." Defs.' PFF ¶ 28, Bates No. 1, SCW_108; *see also id.* ("[t]he GHG emissions associated with the F-35A beddown EIS have been estimated at 731 tons for the construction projects.").

hypothetically disagree with the NGB's conclusions.  But even if Plaintiff's claim was supported

by more than a bald assertion, NEPA relates only to an agency's process.  *See Ind. Forest All.,*

*Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 861 (7th Cir. 2003) ("NEPA does not demand scientific

unanimity in order to support a FONSI.").

       Moreover, Plaintiff's argument is utterly unsupported by the record, as the final EA

addresses each of Plaintiff's concerns.  The NGB thoroughly examined potential PFAS

contamination as discussed above.  *See* pages 11-15 above.  As to pollutants caused by the

construction of projects in the EA, the NGB similarly engaged in a detailed evaluation of the

emissions from the construction projects.  *See* pages 20-22 above.  And the NGB also looked at

effects of the construction projects on water, Defs.' PFF ¶ 52, Bates No. 1, SCW_110-11, and

potential dispersal of hazardous materials, *id.* at Bates No. 1, SCW_113-14, among other effects.

This analysis satisfies NEPA, particularly given "[a]n agency's determination regarding the

extent and effect of the cumulative impacts implicates 'substantial agency expertise.'"  *Habitat*

*Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 528 (7th Cir. 2012) (citation omitted).

       Finally, the NGB appropriately chose not to separately analyze the effects of the F-35A

Operational Beddown in the EA.  *See* pages 8-10 above.  But potential basing F-35As was

analyzed as part of the final EA's discussion of cumulative impacts, including noise effects from

deployment, Defs.' PFF ¶ 27, Bates No. 1, SCW_109, as well emissions.  Defs.' PFF ¶ 28,

Bates No. 1, SCW_108-09.  And to the extent Plaintiff challenges the analysis of noise from the

EA Projects, the NGB noted that "[u]nder the Proposed Action at the 115 FW installation,

construction projects are inside the installation boundaries and would introduce short-term noise

increases; however, these would not generate noise levels to cumulatively affect or change land

use compatibilities … The Proposed Action described in this EA would not contribute additional cumulative impacts to land use." Defs.' PFF ¶ 53, Bates No. 1, SCW_109.

    **B.**     <u>The Construction Activities Did Not Require Preparation of an Environmental Impact Statement</u>

Given the effects discussed above (as well as others not challenged by Plaintiff) the NGB concluded that the Projects would have no significant effect on the environment and thus that preparation of an EIS was not warranted. Plaintiff, repeating many of the same arguments as above, believes that conclusion improperly ignores potential basing of F-35A aircraft and minimizes the potential harm from PFAS contamination. But those arguments are not in keeping with the record or the regulations implementing NEPA.

"No EIS need be prepared where the proposed action will not *significantly* affect the quality of the environment." *City of Evanston v. Reg'l Transp. Auth.*, 825 F.2d 1121, 1125 (7th Cir. 1987). To make that determination, "[t]he CEQ regulations require agencies to examine two dispositive considerations in formulating an EA to determine whether the proposed action may have a significant effect on the environment, thereby requiring an EIS: 'context and intensity.' *Ind. Forest All., Inc.,* 325 F.3d at 856 (citing 40 C.F.R. § 1508.27; 42 U.S.C. § 4332(2)(C)).

Based on the analysis of the various effects described above, Plaintiff claims that the NGB should have prepared an EIS, rather than an EA, "because the construction activities, taken together, are a major Federal action with significant cumulative and secondary environmental impacts." Pl.'s Mem. 8. In addition, plaintiff claims that NGB did not appropriately account for the PFAS "levels that would leave Truax either by soil or groundwater contamination," *id*. at 9, in determining the Projects did not warrant preparation of an EIS.

As an initial matter, Plaintiff's claim regarding the "construction activities" simply repeats its improper segmentation argument, which, as discussed above, is at odds with NGB's

detailed explanation in the record providing the independent basis for the Projects. Further, Plaintiff's argument regarding PFAS both ignores the NGB's detailed explanation regarding why PFAS is not anticipated to leave the base during construction (due to the nature of construction and/or the implementation of MMPs for projects occurring in areas of PFAS contamination, *see* pages 11-15, above) and fails, as described below, to grapple with the standard for when an EIS is required.

Indeed, Plaintiff does not state which factor in 40 C.F.R. § 1508.27 it believes potential adverse effects from PFAS contamination implicate, and its argument fails on that ground alone, given that "mere allegations of deficiencies cannot require preparation of an EIS." *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 231-32 (5th Cir. 2006). Assuming, however, for sake of argument, that Plaintiff believes that the presence of PFAS increases the potential adverse effects of the Projects and their effects on public health, *id*. § 1508.27(b)(1), (b)(2), the NGB explained that the use of MMPs would eliminate expected adverse effects from any release of PFAS resulting from construction taking place in the PRLs identified in the EA. *See* pages 11-15, above (concluding that given PFAS was not expected to leave Truax Field, the Project did not result in significant effects on the environment); *see also* Defs.' PFF ¶ 43, Bates No. 59, SCW_11730 ("Construction best management practices can be implemented to help ensure that PFAS-impacted soils or storm water run-off from the construction sites do not discharge to outfalls, and eventually to the nearby surface water bodies.").

And when "an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Sauk Prairie Conservation All. v. U.S. DOI*, 944 F.3d 664, 678 (7th Cir. 2019) (quoting *Mineta*, 349 F.3d at 953). Indeed, even if one or more

factors in 40 C.F.R. § 1508.27 is implicated, the Seventh Circuit has explained that the mere presence of a factor—or multiple factors—does not require preparation of an EIS. *See, e.g., Mineta*, 349 F.3d at 953, 957; *see also Hillsdale Env't. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1180 (10th Cir. 2012) ("Regardless of which § 1508.27(b) factor is implicated, a project's potential to affect one of these factors does not require an agency to prepare an EIS. The relevant analysis is the degree to which the proposed action affects this interest, not the fact it is affected.") (citation omitted). As such, and in the face of Plaintiff's failure to offer any specific rationale or evidentiary support, beyond hypotheticals, for why preparation of an EIS was required, the NGB's conclusion is reasonable and entitled to deference.

## III.   The National Guard Was Not Required to Complete a Supplemental Environmental Assessment

Whether supplementation of an EIS or EA is required "turns on the value of the new information to the still pending decisionmaking process ... and if the new information is sufficient to show that the remaining action will affec[t] the quality of the human environment in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374. However, "post-approval functions" such as "monitoring and compliance activities" "do not trigger NEPA's requirements." *Ctr.for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013).

Plaintiffs allege a supplemental EA should have been prepared for three reasons. First, plaintiff claims that in October 2019 "the Wisconsin Department of Natural Resources [ ] sent a letter to the City, Dane County and National Guard notifying them that all were legally responsible for contamination at two 'burn pits' where firefighters had trained with PFAS

foams." Pl.'s Mem. 10. Second, that same month, "the Mayor of the City of Madison called on the Air National Guard to address contamination at Truax Field." *Id*. And, third, in November 2020, the City of Madison "sought additional funds for PFAS testing and planning at the Dane County Regional Airport, Air National Guard 115th Fighter Wing Base, and surrounding area." *Id*. None of those actions, even if relevant, warrant consideration of a supplemental EA.

Plaintiff's argument conflates states or local actors' efforts to address legacy PFAS contamination with new information. Said differently, Plaintiff refers to actions, all taken after issuance of the final EA and FONSI, by other state and local governments to address *existing* PFAS contamination at Truax Field, rather than any new *information* as to the analysis in the final EA sufficient to merit supplementation. But NEPA is concerned with the effects of new federal agency actions, not legal obligations for preexisting conditions. *See Mineta*, 349 F.3d at 954 ("the key question is whether there is a nexus between the [] Project, which the defendants are implementing and which NEPA and its regulations govern, and the *preexisting* contamination … which, apart from the Project, NEPA and its regulations do not affect."). In other words, that state and local governments expressed views as to the NGB's obligation to address PFAS already present at Truax Field is of no instance here, as Plaintiff's NEPA claims only implicate the effects of the Projects analyzed in the final EA. Plaintiff makes no claim that the information it relies on relates to the Projects or calls into question the validity of the analysis in the final EA, and the information therefore does not merit supplementation.

IV.     **The National Guard Properly Considered Alternatives**.

Plaintiff argues that the NGB failed to properly consider alternatives to the Projects because it did not assess an alternative that included only some of the Projects (presumably only those occurring on areas without any PFAS contamination). But the NGB explained in detail that *all* the Projects were necessary to meet the purpose and need of the action, and particularly

that the two projects taking place in PRLs were needed to do so.  As such, while Plaintiff is correct that the NGB did not include additional alternatives in the final EA, that choice was reasonable and based on the needs of the 115 FW.

The inquiry into consideration of reasonable alternatives is "independent of the question of environmental impact statements, and operative even if the agency finds no significant environmental impact." *River Rd. All., Inc.*, 764 F.2d at 452.  "When … an agency makes an informed decision that the environmental impact will be small, a view which we are required to accord deference, a 'less extensive' search is required.  *Id.* ("[T]he smaller the impact, the less extensive a search for alternatives can the agency reasonably be required to conduct.").  The Seventh Circuit therefore analyzes alternatives under a "rule of reason," which governs "both which alternatives the agency must discuss, and the extent to which it must discuss them." *Mineta*, 349 F.3d at 960.

Against that standard, Plaintiff argues that "[t]he NGB failed to consider completing only the sub-projects which would not result in land disturbance and therefore not have the potential to increase emissions of PFAS."  Pl.'s Mem. 14.  In particular, it claims "defendants failed to take a look at any alternative other than not doing the project."  *Id.*

As an initial matter, no party that submitted comments on the draft EA, including Plaintiff here, raised the issue of proceeding with an alternative that eliminated certain Projects that would take place in PRLs.  PFF ¶ 55, Bates No. 59.  As such, Plaintiff has forfeited any objection to the final EA on this ground.  *See DOT v. Pub. Citizen*, 541 U.S. 752, 764 (2004) ("None of the respondents identified in their comments any rulemaking alternatives beyond those evaluated in the EA, and none urged [the agency] to consider alternatives.  Because respondents did not raise these particular objections to the EA, [the agency] was not given the opportunity to

28

examine any proposed alternatives to determine if they were reasonably available.  Respondents have therefore forfeited any objection to the EA on the ground that it failed adequately to discuss potential alternatives to the proposed action.").

Moreover, an agency must only consider those alternatives that are reasonable.  32 C.F.R. § 989.8(a).  And a "reasonable" alternative is one that "meet[s] the underlying purpose and need for the proposed action and that would cause a reasonable person to inquire further before choosing a particular course of action."  *Id*. § 989.8(b).  Here, the record makes clear that those projects, which were identified as having the potential to release PFAS (Projects 15 and 19, PFF ¶ 44, Bates No. 1, SCW_102-103), were essential to meeting the purpose and need of the proposed action, such that consideration of an alternative eliminating those projects would not have been reasonable.  That purpose and need was to, among other things, allow the 115 FW to "accomplish [its] mission in a safe and efficient manner" by "upgrading facilities to meet current safety and security standards." PFF ¶ 13, Bates No. 1, SCW_19.

In particular, as to project No. 15 the EA notes that "[t]he existing boundary fence is not currently up to airport BASH standards."  PFF ¶ 16, Bates No. 1, SCW_15.  Those standards provide that, among other things, fencing surrounding airports should be 10 feet high.  PFF ¶ 17, Bates No. 67, SCW_12239; *id.* at Bates No. 69, SCW_12449; *see also* Fed. Aviation Admin., *National Part 139 CertAlert No. 16-03*, at 2 (Aug. 3, 2016) (*available at* https://www.faa.gov/airports/airport_safety/certalerts/media/part-139-cert-alert-16-03.pdf).  And the IDP identified that the fencing was necessary to create a security perimeter in the maintenance area.  PFF ¶ 18, Bates No. 61, SCW_11900, SCW_11902 (fence would "mitigate" various "safety concerns"); *see also id*. at Bates No. 64, SCW_12107.  As to project No. 19, the EA explained that construction of a "1,500 SF bay on the south side of B430 for a second crash

truck" would "provide adequate space needed to fulfill mission requirements."  PFF ¶ 19, Bates No. 1, SCW_30.

Further, the NGB explained that "[d]uring the project siting phase, alternative locations for each construction project were evaluated based on the mission needs of each unit and other selection criteria such as the ability to collocate like services, site availability, and facility condition.  Based on this evaluation, with the exception of those projects that have alternative locations and those alternatives listed below, the proposed location for each of the construction projects was determined to be the only feasible alternative that met the purpose and need of this Proposed Action."  PFF ¶ 54, Bates No. 1, SCW_33.  As such, consideration of an alternative that removed these two projects would not have been reasonable.  *See Habitat Educ. Ctr., Inc.*, 593 F. Supp. 2d at 1028 ("Because plaintiffs' proposal would not have satisfied this purpose, it was not a 'reasonable' alternative entitled to detailed evaluation.").

Finally, even if the NGB's consideration of only the no-action alternative was not clearly supported by the fact that inclusion of projects 15 and 19 was necessary to meet the Projects' purpose and need, an agency need not consider a set number of alternatives.  Instead, consideration of only the preferred and the no-action alternative can be proper.  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) ("To the extent that [plaintiff] is complaining that having only two final alternatives—no action and a preferred alternative—violates the regulatory scheme, a plain reading of the regulations dooms that argument. So long as 'all reasonable alternatives' have been considered and an appropriate explanation is provided as to why an alternative was eliminated, the regulatory requirement is satisfied.  In short, the regulation does not impose a numerical floor on alternatives to be considered."); *see also Native Vill. of Nuiqsut v. BLM*, 432 F. Supp. 3d 1003, 1040 (D. Alaska

2020) (An agency need not "consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives."). Thus, Plaintiff's belief that the final EA was flawed because it only considered the no-action alternative in addition to the preferred alternative is not in keeping with NEPA's requirements.

## VI.   Public Notice and Outreach Was Sufficient

Plaintiff claims NGB erred by "by failing to inform the public of its proposed action and failing to allow for meaningful and timely public involvement." Pl.'s Mem. 17. In particular, Plaintiff alleges that the notices were inadequate because draft EAs were not placed in local community centers, and notices were not placed in free publications. *Id*. And Plaintiff also claims that NGB "should have held a public hearing and answered questions from low-income and minority people who live in the affected area . . . ." *Id*.

But the NGB issued public notice and considered public comments. PFF ¶ 22, Bates No. 1, SCW_11, SCW_25. Public involvement is detailed in Appendix B to the final EA, *id.* at Bates No. 1, SCW_157-58 (public notices), SCW_159-75 (public comments). Specifically, the NGB published notice as to availability of the draft EA for review in two inserts in the Wisconsin State Journal, a local newspaper, and also solicited comments. PFF ¶ 23, Bates No. 1, SCW_157-58. In response the NGB received five comments from the public, as well as comments from state and federal government agencies. Defs.' PFF ¶ 55, Bates No. 59.

That process met the requirements of 32 C.F.R. § 989.24(a) and 40 C.F.R. § 1506.6(a). In particular, 40 C.F.R. § 1506.6(a) requires that an agency make "diligent efforts to involve the public," and § 1506.6(b) requires that an agency provide public notice of the availability of environmental documents. The NGB did both. And although Plaintiff argues that notices must be placed in community centers and free publications, 40 C.F.R. § 1506.6(b)(3) authorizes an

agency to place notice in local newspapers, local media, newsletters, or direct mailing (among other options).  *See also* 32 C.F.R. § 989.24(c) ("For actions of local concern, the list of possible notification methods in 40 C.F.R. 1506.6(b)(3) is only illustrative.  The [agency] may use other equally effective means of notification as a substitute for any of the methods listed.").  The NGB's notices in the Wisconsin State Journal were therefore sufficient under NEPA.

## VII.   The Court Should Disregard Plaintiff's Submission of Extra-Record Declarations and Exhibits.

Last, in a number of instances Plaintiff relies on arguments made in declarations (and supporting exhibits) it submitted along with its motion for summary judgment.  *See* ECF Nos. 15-17.  The Court should disregard the claims made in those declarations.

As an initial matter, review of claims brought under the APA, including NEPA, is limited to the administrative record.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999) ("Deferential review of an administrative decision means review on the administrative record."); *see also Mineta*, 349 F.3d at 958.  In other words, "[c]onfining the district court to the record compiled by the administrative agency rests on practical considerations that deserve respect.  Administrative agencies deal with technical questions, and it is imprudent that the generalist judges of the federal district court and courts of appeals consider testimonial and documentary evidence bearing on those questions unless the evidence has first been presented to and considered by the agency."  *Cronin v. USDA*, 919 F.2d 439, 444 (7th Cir. 1990).  So too here, the Court should confine its review to the robust AR submitted and certified by the NGB, a record Plaintiff chose not to contest during the time

32

set forth by the Court for Plaintiff to do so.  ECF No. 9 at 2 (objections to AR due by May 14, 2021).

Further, Plaintiff does not even attempt to meet the standard for submitting extra-record evidence, and the Court should disregard Plaintiff's declarations on that ground alone.  *See Habitat Educ. Ctr., Inc. v. Bosworth*, 381 F. Supp. 2d 842, 848 (E.D. Wis. 2005) (plaintiff "challenging agency action under NEPA" "bears the burden of proof").  That standard provides "that courts can look beyond the administrative record when (1) evidence suggests bad faith or improprieties may have influenced the decisionmaker; (2) it appears that the agency has relied on substantial records and materials not included in the record; or (3) the procedures utilized and factors considered by the decisionmaker require further explanation for effective review." *Sokaogon Chippewa Cmty. v. Babbitt*, 929 F. Supp. 1165, 1172 (W.D. Wis. 1996); *see also Miami Nation of Indians of Ind., Inc. v. Babbitt*, 55 F. Supp. 2d 921, 923-24 (N.D. Ind. 1999) (same).  Plaintiff fails to address any of those factors.  *See id.* at 1173 ("a party must make a 'strong showing' that one of these exceptions applies before a court will allow extra-record inquiry.") (citation omitted).  As such, the Court should disregard Plaintiff's extra-record evidence.

## CONCLUSION

For the reasons stated above, the Court should grant summary judgment to Defendants on all of Plaintiff's claims.

Respectfully submitted this 30th day of July, 2021,


TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

33

*/s/ Gregory M. Cumming*

Gregory M. Cumming (D.C. Bar No. 1018173)
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
150 M St., N.E.
Washington, D.C. 20002
(202) 598-0414 (phone)
gregory.cumming@usdoj.gov

*Counsel for Defendants*