IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SAFE SKIES CLEAN WATER
WISCONSIN, INC.,

                Plaintiff,

    v.

NATIONAL GUARD BUREAU, *et al.*,

                Defendants.

Case No. 3:20-cv-1086-wmc

---

### DEFENDANTS' RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

---

      Pursuant to Sections II.A.1 and II.D of this Court's Summary Judgment Procedures, Defendants provide the following responses to Plaintiff's Proposed Findings of Fact, ECF No. 13 ("Pl.'s Prop. Findings"). As provided in the Court's Procedures, Defendants' responses to each of Plaintiff's proposed findings of fact is set out in **bold** following each of Plaintiff's numbered statements.

1.      Department of Defense (DoD) Directive 5105.77 established the National Guard Bureau ("NGB") as a joint activity of the DoD, and describes the organization and management of the NGB, which includes the Director of the Air National Guard ("ANG"). (Administrative Record ("AR") 3.)

**Undisputed.**

2.      The ANG is a federal military reserve force of the U.S. Air Force ("Air Force"). (AR 4317.)

**Dispute. Plaintiff's assertion is found at Bates No. 19, SCW_4318, not Bates No. 1, SCW_4317.**

3.      The NGB, on behalf of the ANG, prepared an EA (AR 1-180) to evaluate the potential

consequences to the human and natural environment that would result from implementation of construction and demolition projects ("the Project") at the 115th Fighter Wing ("115 FW") of the Wisconsin Air National Guard ("WIANG"). (AR 3.)

**Undisputed.**

4.      The NGB issued a Finding of No Significant Impact ("FONSI"). (AR 12.)

**Undisputed.**

## VENUE[1]

5.      The property that is the subject of the action is located in Madison, WI (AR 4-7); the F-16s are located at Truax in Madison; (AR 4-7); the F-35s are slated to come to Truax (AR 105); and Plaintiff is located in Madison, WI (Klafka Decl. ¶ 9).

**Dispute. The final Environmental Assessment ("EA") provides only that Truax Field was a preferred alternative for basing F-35A aircraft, not that the jets were certain to be based at Truax Field. Bates No. 1, SCW_105.**

## PARTIES

6.      Safe Skies Clean Water WI, Inc. ("Safe Skies") is a nonprofit corporation organized under the laws of Wisconsin. (Klafka Decl. ¶ 8.)

**Defendants dispute this statement to the extent that Plaintiff relies on evidence outside of the administrative record. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999) ("Deferential review of an administrative decision means review on the administrative record.").**

---

[1]     The headings in Defendants' response correspond to the major headings in Plaintiff's Proposed Findings, ECF No. 13, and Defendants include them solely to provide convenient reference to that document. They do not form any part of Defendants' responses.

7.     Safe Skies' purpose is to educate the public concerning the dangers inherent in basing F-35A Joint Strike Fighter jets at Truax Air National Guard base in Madison as well as the need for the NGB, Air National Guard and Air Force to clean-up existing contamination of groundwater, surface water, drinking water and soils, caused by the use of fire-fighting foams and other materials on the base. (Klafka Decl. ¶ 25.)

**Defendants dispute this statement to the extent that Plaintiff relies on evidence outside of the administrative record.  *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

8.     Safe Skies is concerned about and informs its members about the large amount of per- and polyfluoroalkyl substances ("PFAS") emitted from the base and known to be polluting municipal wells, particularly in low-income neighborhoods near the airport, as well as the groundwater, soils, Starkweather Creek and Lake Monona, which may eventually affect the entire Yahara chain of lakes. (Klafka Decl. ¶ 26.)

**Defendants dispute this statement to the extent that Plaintiff relies on evidence outside of the administrative record.  *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

9.     Per- and polyfluoroalkyl substances (PFAS) refers to a large group of man-made chemicals that include PFOA, PFOS, GenX, and thousands of other chemicals. PFOA and PFOS have been the most extensively studied and are currently the only two PFAS chemicals for which the USEPA has established lifetime drinking water Health Advisories for ground water (0.07

microgram per liter [μg/L] of PFOS, PFOA, or the combined concentrations of the two compounds) and calculated Regional Screening Levels for soil (1,260 micrograms per kilogram [μg/kg]). (AR 68.)

**Undisputed.**

10. Safe Skies is also concerned about the noise impacts from the F-16s and the proposed F-35s. (Klafka Decl. ¶ 27.)

**Defendants dispute this statement to the extent that Plaintiff relies on evidence outside of the administrative record.  See *Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

11. Safe Skies accomplishes its mission by informing the local citizenry of the NGB's plans and their potential negative environmental and socioeconomic impacts on the community by means of a website, newsletters, forums and public activity. It has a mailing list of over 2,000 people. (Klafka Decl. ¶ 28.)

**Defendants dispute this statement to the extent that Plaintiff relies on evidence outside of the administrative record.  See *Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

12. Since 2018, Safe Skies has sponsored a series of public forums, appeared on radio shows, and brought speakers to Madison for presentations, press conferences and interviews. (Klafka Decl. ¶ 31.)

**Defendants dispute this statement to the extent that Plaintiff relies on evidence outside of the**

administrative record. *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").

13. Safe Skies' members will be harmed by the projects listed in the EA in that many of its members reside in locations that have and will suffer the impacts of the increased discharges of PFAS that will result from the construction activities authorized in the EA in that they drink from wells that already have PFAS in them, recreate in Lake Monona, and some eat fish from Starkweather Creek and Lake Monona that have PFAS in them. (Klafka Decl. ¶ 29; Blume Decl. ¶¶ 24, 25, 27; Islam Decl. ¶¶ 24-27.)

**Dispute. The final EA explains that "[w]ith proper media management no further contamination or migration of PFOS or PFOA from the soil or water would be expected to occur." Bates No. 1, SCW_102;** *see also id***. at SCW_103.**

14. Many of Safe Skies' supporters reside near the Airport and in the flight path of the F-16s and F-35s and those supporters will suffer greatly from the increased noise the F-35s will bring to Madison. (Klafka Decl. ¶ 30; Blume Decl. ¶¶ 16, 18, 19; Islam Decl. ¶¶ 16-21.)

**Defendants dispute this statement to the extent that Plaintiff relies on evidence outside of the administrative record.** *See Camp*, **411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.");** *Perlman*, **195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record."). In addition, Defendants dispute this statement because the final EA provides that "[n]oise associated with the proposed construction would be intermittent and temporary and considered minor when compared to noise from airport operations. No changes to aircraft type or operations would**

5

**occur under the Proposed Action. No sensitive noise receptors, such as residential areas, are located within one-half mile of the 115 FW installation." Bates No. 1, SCW_24-25.**

15.  The interests of Plaintiff and its members are harmed by the actions proposed in the EA. (Klafka Decl. ¶¶ 29, 30, 33; Blume Decl. ¶¶ 24, 25, 26, 36; Islam Decl. ¶¶ 19, 20, 29, 31.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record. *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record."). In addition, this statement contains characterizations and legal conclusions, not material assertions of fact.**

16.  This Court can redress the injury of Plaintiff by requiring the NGB to complete a Environmental Impact Statement and/or Supplemental EA. (Klafka Decl. ¶¶ 53, 54; Blume Decl. ¶¶ 23, 38; Islam Decl. ¶¶ 22, 30.).

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record. *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record."). In addition, this statement contains characterizations and legal conclusions, not material assertions of fact.**

17.  The NGB is a joint activity of the Department of Defense (DOD Directive 5105.77.) (AR 3.)

**Undisputed.**

18. The NGB, as an agency of the federal government, is required to comply with various laws and regulations, including the National Environmental Policy Act ("NEPA"; 42 U.S.C. §§ 4321 *et seq*.), the Council on Environmental Quality's NEPA regulations, 40 C.F.R. Parts 1500 to 1508, and the Air Force's own NEPA-implementing regulations, 32 C.F.R. Part 989. (AR 20, 11970.)

**Dispute. The record citations provided by Plaintiff only support that the NGB is an "agency of the federal government."**

19. The NGB is the lead agency for the EA pursuant to 40 C.F.R. §§ 1501.5 and 1508.5. (AR 3.)

**Undisputed.**

20. General Daniel R. Hokanson is the current Chief of the National Guard Bureau. He is named as a defendant in his official capacity. (Defendants' Answer ("Def. Ans.") ¶ 22.)

**Undisputed.**

## FACTUAL BACKGROUND

### The 115th Fighter Wing and the Project

21. The 115th Fighter Wing ("115 FW") is a unit of the Wisconsin Air National Guard, ("WIANG") which is stationed at Truax Field Air National Guard Base, Madison, Wisconsin. (AR 7065.)

**Undisputed.**

22. Since 1942 the Truax Field Base has stored petroleum and various types of hazardous materials including fire-fighting foam. (AR 1164, 1964.)

**Dispute. The administrative record does not support Plaintiff's assertion that Truax Field was used to store "fire-fighting foam." Bates No. 11, SCW_1164; Bates No. 17, SCW_1964.**

23. Enforcement of RCRA did not occur until November 18, 1980; therefore, any pre-1980

7

construction buildings that have contained hazardous materials or petroleum products (e.g., vehicle or aircraft maintenance, vehicle storage, fueling operations, or chemical storage) are suspected for hazardous material or petroleum spills. (AR 1117; 1123; 1124.)

**Dispute to the extent that Plaintiff's citation to Bates No. 11, SCW_1123-24 does not support Plaintiff's statement.**

24. In 2015 and 2017, the NGB commissioned a study of nine potential release sites ("PRLs") that could be releasing perfluorinated compounds ("PFCS" – referred to as PFOAs in this Complaint) (perfluorobutane sulfanate ("PFBS"), perfluorooctanoic acid ("PFOA"), and perfluorooctane sulfanate ("PFOS"). (AR 68, 101.) The Final Report prepared for the NGB was released in March, 2019. (AR 1941-4105.) *(Note: Plaintiff's Complaint, ¶ 25, mistakenly states the release date of this report was October, 2019, instead of March, 2019.).*

**Dispute. In 2015 a Preliminary Assessment ("PA") was conducted to identify PFAS potential release locations ("PRLs") at Truax Field. The results of the PA were released in December 2015. Bates No. 53, SCW_11563;** *see also* **Bates No. 1, SCW_68. The PA identified nine PRLs.** *Id***. Based on that recommendation the NGB commissioned a more detailed site inspection ("SI"), the results of which were released on April 1, 2019. Bates No. 17, SCW_1941.**

25. The Final Report shows that there is PFAS contamination in excess of the USEPA guidelines in soil in two of the sites, and in the groundwater at all nine sites including at the base boundary. (AR 1958.)

**Dispute. The SI identified that "each of the nine PRLs" contained soil or groundwater PFAS in excess of U.S. Environmental Protection Agency screening criteria. Bates No. 17, SCW_1956-59.**

26. The Report recommended further investigation at all nine sites to determine the nature and

8

extent of the PFAS release on and off the base in soil and groundwater. (AR 1957, 2003.)

**Dispute. The SI recommends "further investigations of each of the nine PRLs as a result of groundwater and/or soil exceedances." Bates No. 17, SCW_1957.**

27. In October, 2019, the NGB issued an EA and FONSI for 27 separate construction and demolition actions (hereinafter, "sub-parts" of the Project) at the 115th Fighter Wing Installation, Dane County Regional Airport, Madison, Wisconsin. (AR 1.)

**Undisputed.**

28. The purported purpose of the Project is to: "provide the facilities and training opportunities necessary to ensure that the 115 FW can accomplish their mission in a safe and efficient manner. For the 115 FW to continue to meet their mission goals, the NGB needs to provide facilities that are properly sized and configured to meet the demands of the continuously evolving mission of the 115 FW. The proposed construction and renovation projects will improve mission efficiency by improving base access and utilities, consolidating mission functions, and upgrading facilities to meet current safety and security standards. The proposed demolition actions will remove excess, obsolete, deteriorating, and underused facilities." (AR 19.)

**Disputed. The final EA provides the stated, not "purported," purpose of the project. Bates No. 1, SCW_19.**

29. New construction will result in the disturbance of 25.1 acres of land, and a net increase of 1.2 acres of new impervious surface. (AR 109.)

**Undisputed.**

30. Preliminary estimates of the construction required place the total cost of construction, demolition, and renovation between 40 and 60 million dollars. (AR 27.)

**Undisputed.**

31. At the same time that the Report on PFAs was issued and that the NGB was drafting and

submitting the EA for comments, the Air Force was preparing an Environmental Impact Statement ("EIS") for the F-35A Operational Beddown Air National Guard. (AR 105-107; 456- 458.)

**Undisputed.**

32. The draft EIS was put out for Comment on February 7, 2019, and the draft EA put out for Comment on April 7, 2019. (Def. Ans. ¶ 33; AR 25.)

**Undisputed.**

33. The EIS was finalized in February 2020, just a few months after the EA was finalized. (Def. Ans. ¶ 34.).

**Undisputed.**

34. On page 1-1 of the EIS, the Air Force states, "The F-35A would replace the existing F-15, F-16, or A-10 fighter attack aircraft…." (Def. Ans. ¶ 35.).

**Undisputed.**

35. The work in the EA is not being done with the expectation for keeping F-16s at Truax, but is being done in preparation for F-35s. (AR 105-109, 113, 456, 468, 11734.)

**Dispute. The EA provides that the Projects are necessary "to allow the 115 FW to "accomplish [its] mission in a safe and efficient manner" such as by "upgrading facilities to meet current safety and security standards." Bates No. 1, SCW_19.**

### The City of Madison's Drinking Water Supply and PFAS in Wells

36. The City of Madison relies on wells for its public drinking water supply. (AR 50, 4124, 4558.)

**Undisputed.**

37. The City has been aware of PFAS problems in drinking water for years, and the City has detected PFAS in every well in Madison. (Klafka Decl. ¶ 35.).

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record.** *See Camp*, **411 U.S. at 142 ("[T]he focal point for judicial review should be the**

10

administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").

38. The municipal well closest to Truax Air Field ("Well No. 15") was shut down in 2019 by the City of Madison due to the PFAS contamination in that well. (Klafka Decl. ¶ 36; Blume Decl. ¶ 28; Islam Decl. ¶¶ 25, 26.).

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record. *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

39. The City is monitoring all other municipal wells, with the highest levels of PFAS contamination indicated near and southeast of the base. (Klafka Decl. ¶ 37.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record. *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

40. As the Final Report shows, PFAS are known to be present in groundwater at Truax Field:

Given that groundwater flow is to the east/southeast and that samples at the Base Boundary have exceedances, groundwater with PFC concentrations above applicable screening criteria is very likely present off-Base to the south and east. (AR 1959.)

**Undisputed.**

### The 303(d) Impaired Waters in the Madison Area

41. The west branch of Starkweather Creek drains the area around the Airport and flows into Lake Monona. (AR 1967.)

11

**Dispute.  Starkweather Creek empties into Lake Monoa.  Bates No. 17, SCW_1967.**

42. Both Starkweather Creek and Lake Monona are on the 2018 Wisconsin Impaired Waters List for multiple pollutants. (AR 5537.)

**Dispute.  Starkweather Creek is listed on the "2012 and Draft 2014 Wisconsin 303(d) List of Impaired Waters."  Bates No. 34, SCW_5537.**

43. The 2019 report on PFAS found that PFAS levels in groundwater samples were *569 times* the EPA health advisory level. (AR 2012 (PRL 1).)

**Dispute.  The SI identified that for PRL No. 1 PFAS levels were 39.841 micrograms/liter, above the EPA's health advisory concentration.  Bates No. 17, SCW_2012.**

44. Soil PFOS levels were up to *29 times* the EPA health advisory level in one location. (AR 2011 (PRL 2).)

**Dispute.  The SI does not provide a health advisory level for soil concentrations.  Bates No. 17, SCW_2011.**

45. In the same month that the EA was issued, in October, 2019, high levels of PFAS were found in Starkweather Creek, and the Wisconsin Department of Natural Resources ("DNR") sent a letter to the City, Dane County and National Guard notifying them that all were legally responsible for contamination at two "burn pits" where firefighters had trained with PFAS foams. (Klafka Decl. ¶ 38.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record.  *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

46. Also in October 2019 the Mayor of the City of Madison called on the Air National Guard to address contamination at Truax Field. (Klafka Decl. ¶ 39.).

12

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record. See Camp, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); Perlman, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

47.     There is no evidence the ANG addressed the contamination. (Klafka Decl. ¶ 40.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record. See Camp, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); Perlman, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

48.     In November 2020, the City sought additional funds for PFAS testing and planning at the Dane County Regional Airport, Air National Guard 115th Fighter Wing Base, and surrounding area. (Klafka Decl. ¶ 41.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record. See Camp, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); Perlman, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

49.     The NGB has not adequately characterized the extent of PFAS contamination it has caused and should supplement this EA after conducting the testing sought by the DNR and City of Madison. (Klafka Decl. ¶ 42.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record. See Camp, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the**

reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record."). In addition, the final EA addresses possible PFAS contamination. Bates No. 1, SCW_68.

50. The EA also discusses a much smaller quantity of greenhouse gases that will be emitted than if the projects were discussed together. (AR 8, 5,542.)

**Dispute. Plaintiff's citation refers to an EA finalized in January 2015, Bates. No. 34, not the final EA at issue in this lawsuit. Bates No. 1. The final EA at issue in this suit discusses greenhouse gas emissions at Bates No. 1, SCW_78.**

51. The adverse health impacts of the project which were not presented in the EA include uninvestigated and unmitigated PFAS contamination and could include increased PFAS discharges to Starkweather Creek, Lake Monona, public drinking water systems, and in fish consumed by the public. (Klafka Decl. ¶ 43.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record. *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record."). In addition, the final EA discusses the impacts of PFAS at Bates No. 1, SCW_102-03.**

52. Additional adverse health impacts of the project which were not presented in the EA include the deafening noise from current F-16 fighter jets and the increased noise from the proposed F-35s. (AR 9, 1633; Klafka Decl. ¶ 43.).

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record. *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative**

decision means review on the administrative record."). In addition, the final EA provides that noise is "not expected to be affected or may be negligibly affected by implementation of the alternatives" because "[n]o changes to aircraft types or operations would occur under the Proposed Action." Bates No. 1, SCW_24-25.

53. F-35s are projected to be four times noisier than F-16s. (Islam Decl. ¶ 20; Blume Decl. ¶ 21.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record.** *See Camp*, **411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.");** *Perlman***, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

54. The EA acknowledges that water leaves the Base: "3.5 Surface Water Hydrology: Surface water drainage from the Base ultimately drains west into Starkweather Creek, which surrounds the Base on the north, west, and south sides. Starkweather Creek empties into Lake Monona approximately 2 miles to the south. Surface water flow around the Base is directed by man-made ditches and culverts which connect to Starkweather Creek. Because much of the Base is paved, infiltration and evapotranspiration of surface water are negligible." (AR 1967.)

**Undisputed to the extent that Plaintiff refers to the SI, rather than the final EA.**

55. Additional adverse impacts are that water bodies already classified as impaired under Section 303(d) of the Clean Water Act could be made even more polluted by the increased amounts of PFAS and other toxins that will migrate from the base into the groundwater and stormwater. (Klafka Decl. ¶ 46.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record.** *See Camp*, **411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the**

15

reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record."). In addition, the final EA discusses impacts to storm water and surface water as a result of the Proposed Action. Bates No. 1, SCW_82-83, 89.

56. The EA points out that 18% of the City of Madison's low-income population, and 21% of the City's minority population, live in the vicinity of the 115 FW installation. (AR 11.)

**Dispute. The citation provided by Plaintiff does not support Plaintiff's statement.**

57. The NGB claims that no pollutants will leave the site during the work on the Project and therefore low-income and minority populations will not be adversely affected. (AR 94.)

**Dispute. The final EA states that "populations, including minority populations and low-income populations outside the boundaries of the installation, would not be significantly impacted by implementation of the Proposed Action. Specifically, contamination within Starkweather Creek is not expected to increase due to construction." Bates No. 1, SCW_94.**

58. The NGB has not completed the investigation recommended in the 2019 Report to determine the extent to which PFAS are migrating off-base. (Klafka Decl. ¶ 50.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record. *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record."). In addition, the final EA analyzes impacts of PFAS from the proposed projects. *See, e.g.*, Bates No. 1, SCW_102-03.**

59. The City of Madison did find that the PFAS migrated off-base and the City closed Well No. 15. (Klafka Decl. ¶ 51; Blume Decl. ¶28; Islam Decl. ¶¶ 25, 26.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record. *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the**

**administrative record already in existence, not some new record made initially in the reviewing court.");** *Perlman*, **195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

60.     "Greenhouse gases (GHGs) are gases that trap heat in the atmosphere. These emissions occur from natural processes as well as human activities. The accumulation of GHGs in the atmosphere regulates, in part, the earth's temperature. Scientific evidence indicates a trend of increasing global temperature over the past century due to an increase in GHG emissions from human activities. Climate change associated with GHGs is producing negative economic and social consequences across the globe." (AR 24.)

**Undisputed.**

61.     "The proposed construction activities would contribute directly to GHG emissions from fossil fuels. Demolition and construction activities would generate 3,405 tons of $CO_2e$ emissions in 2020. To put these emissions in perspective, 3,405 tons of GHGs is the equivalent of 665 cars driving the national average of 11,500 miles per year (USEPA 2018c). These GHG emissions would only be generated during the construction period. The operation of new facilities may result in a small increase in installation-related GHG emissions, primarily through the consumption of electricity and possibly through the combustion of fossil fuel on-site if any oil or natural gas boilers or other heating units are installed in the new facilities. While the GHG emissions generated from the construction activities and building operations alone would not be enough to cause global warming, in combination with past and future emissions from all other sources they would contribute incrementally to the global warming that produces the adverse effects of climate change." (AR 78.)

**Undisputed.**

62.     The NGB states that impacts of greenhouse gas emissions will "contribute incrementally"

17

to the problem. (AR 8, 78, 11958, 12028.)

**Undisputed.**

63.     The EA states that the "CEQ has released *Draft NEPA Guidance on Consideration of the Effects of Climate Change and Greenhouse Gas Emissions*, which suggests that proposed actions that would reasonably emit 25,000 metric tons or more of carbon-dioxide-equivalent gases should be evaluated by quantitative and qualitative assessments. This is not a threshold of significance, but rather a minimum level that would require consideration in NEPA documentation. GHG emissions would not approach the limit of 25,000 metric tons under the Proposed Action." (AR 5542.)

**Dispute. Plaintiff's statement refers to an EA finalized in 2015, Bates No. 43, not the final EA at issue in this lawsuit. Bates No. 1.**

64.     The GHG emissions associated with the F-35A beddown EIS have been estimated at 731 tons for the construction projects. The total for F-35A construction projects and construction projects evaluated in this EA would be 4,136, which is the equivalent of 808 cars each driving the national average of 11,500 miles per year. (AR 12057.)

**Dispute. Plaintiff's statement refers to the draft EA. Bates No. 63. The same data is provided in the final EA. Bates No. 1, SCW_108-09.**

65.     The Final EA failed to account for the air pollution emissions from the current F-16 and proposed F-35 fighter jets. These emissions include an increase in airfield CO2e emissions of approximately 12,478 tons or 135 percent, which is equivalent to adding an additional 2,438 passenger vehicles onto roads, driving 11,500 miles per year on average. The total emissions from the proposed F-35 jets are estimated to be 21,741 tons per year, which is equivalent to 4,278 passenger vehicles driving 11,500 miles per year on average. (Klafka Decl. ¶ 53.)

**Dispute. The final EA discusses existing air quality, Bates No. 1, SCW_40-42, impacts on air**

18

**quality,** *id.* **at SCW_75-78, and cumulative impacts,** *id.* **at SCW_108-109, and also includes an air quality appendix.** *Id.* **at SCW_179-180.**

66. The replacement of the F-16 with the F-35A would result in an increase in long-term emissions [of air pollutants]. (AR 108.)

  Undisputed.

67. The NGB placed two notices in the print edition of the Wisconsin State Journal on April 7 and April 21, 201 stating the draft EA was available. (AR 25.)

  Undisputed.

68. The NGB held no public hearing on the EA. (Klafka Decl. ¶ 48; Blume Decl. ¶ 32; Islam Decl. ¶ 32.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record.** *See Camp***, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.");** *Perlman***, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

69. The NGB never implemented a detailed community outreach strategy aimed at gaining local input from all communities that would be affected and did not offer targeted activities to reach low income and/or minority communities. (Klafka Decl. ¶ 47.)

**Defendants dispute this statement as Plaintiff relies on evidence outside of the administrative record.** *See Camp***, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.");** *Perlman***, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record.").**

19

Respectfully submitted this 30th day of July, 2021,

>TODD KIM
>Assistant Attorney General
>United States Department of Justice
>Environment & Natural Resources Division
>
>*/s/ Gregory M. Cumming*
>
>Gregory M. Cumming (D.C. Bar No. 1018173)
>United States Department of Justice
>Environment & Natural Resources Division
>Natural Resources Section
>150 M St., N.E.
>Washington, D.C. 20002
>(202) 598-0414 (phone)
>gregory.cumming@usdoj.gov
>
>*Counsel for Defendants*