IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SAFE SKIES CLEAN WATER
WISCONSIN, INC.,

                         Plaintiff,

    v.

NATIONAL GUARD BUREAU and
GENERAL DANIEL R. HOKANSON,

                        Defendants.

OPINION AND ORDER

20-cv-1086-wmc

Plaintiff Safe Skies Clean Water Wisconsin, Inc., asserts this action against defendants the National Guard Bureau ("NGB"), a joint activity of the United States Department of Defense and a federal government agency, and its Chief in his official capacity, General Daniel R. Hokanson.  Plaintiff claims that defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C § 4321 *et seq.*, and other administrative provisions in its treatment of the environmental impacts of 27 planned projects at the 115th Fighter Wing installation.  Before the court are the parties' cross motions for summary judgment.  (Dkt. ##12, 18.)  For the reasons that follow, the court will grant defendants' motion and direct entry of judgment in their favor.

UNDISPUTED FACTS[1]

A. Overview of the 115 FW

The 115th Fighter Wing ("115 FW") installation of the Wisconsin Area National

---

[1] Unless otherwise noted, the following facts are material and undisputed.  Citations to "AR" are to the administrative record provided by defendants to the court electronically on a flash drive and certified as the basis for their decisions under NEPA.  (Dkt. ##10, 11.)

Guard is located within the boundaries of the Dane County Regional Airport in Madison, Wisconsin (also known as "Truax Field").  The 115 FW installation covers approximately 155 acres and has over 40 buildings or structures.  As articulated by the Department of Defense ("DOD"), the 115 FW's mission is to staff and train flying and support units to "augment Air Combat Command's general-purpose fighter forces to effectively and rapidly deliver F-16 combat power anywhere in the world for wartime or peacetime missions." (AR 20.)  The 115 FW is also charged with providing "an Aerospace Control Alert commitment for the region under the North American Aerospace Defense Command."  (*Id.*)  Similarly, the 115 FW's stated mission for the State of Wisconsin is to provide trained and equipped units to protect life and property and to preserve peace, order, and public safety as directed by the Governor of Wisconsin.  In support of these missions, the 115 FW currently operates 18 F-16 C/D aircraft and 1 RC-26B aircraft.

### B.  PFAS at 115 FW Installation

The per- and polyfluoroalkyl substances ("PFAS") "refer[] to a large group of man-made chemicals that include PFOA [perfluorooctanoic acid], PFOS [perfluorooctane sulfonate], GenX, and thousands of other chemicals."  (AR 68.)  "PFOA and PFOS have been the most extensively studied and are currently the only two PFAS chemicals for which the [EPA] has established lifetime drinking water Health Advisories for ground water . . . and calculated Regional Screening Levels for soil[.]"  (*Id.*)  PFAS are present at Truax Field

from historic use of "Aqueous Film Forming Foam," which was used for fire suppression.[2] Plaintiff points out that eleven buildings were built prior to enforcement of the Resource Conservation and Recovery Act ("RCRA") in November 1980, and, therefore, "any pre-1980 construction buildings that have contained hazardous materials or petroleum products . . . are suspected for hazardous material or petroleum spills." (AR 1117.)

In December 2015, the NGB received the results of a Preliminary Assessment ("PA") of PFAS at the 115 FW installation. The purpose of the PA was to "identify potential locations of historic environmental releases of Aqueous Film Forming Foam [] from usage and storage" to "determine if a site posed a potential threat to human health and the environment and required additional inspection." (AR 1960.) Based on the findings in the PA, the NGB commissioned a more detailed Site Inspection ("SI"), which was completed in March 2019. (AR 1941-4105.) The SI tested for the presence of PFAS, including testing groundwater and soil sampling, and found PFAS in excess of the EPA guidelines in soil in two of the nine potential release locations ("PRLs") and found them in the groundwater in all nine sites. Specifically, PFAS levels in groundwater samples were in excess of EPA screening criteria. The SI recommended further investigation at all nine sites to determine the nature and extent of the PFAS release.

## C. Environmental Assessment of Proposed Action

To continue to meet its goals, the NGB through the Air National Guard ("ANG")

---

[2] Aqueous film forming foam has been stored at Truax Field since at least 1995. Plaintiff also relies on a chart in the administrative record describing various structures and points out that a number of structures storing petroleum and various types of hazardous materials, including fire-fighting foam, were built in 1942. (Pl.'s PFOFs (dkt. #13) ¶ 22 (citing AR 1164).)

must provide the 115 FW with facilities that are properly sized and configured.  To that end, the NGB identified that the current facilities at the 115 FW installation did "not adequately support current or future mission requirements and/or are not adequately sized." (AR 27.)  A 2012 Installation Development Plan analyzed the installation's needs and outlined "a strategy to modernize facilities and maximize infrastructure to meet current missing requirements for the 115 FW." (AR 11799.)  In addition, a January 2016 "Facilities Board" meeting addressed updates to the 2012 Plan, among other things.

In a draft Environmental Assessment ("EA"), the NBG proposed 27 construction, demolition, and renovation projects (the "Projects") to "support the current mission" by "provid[ing] adequate space needed to fulfill mission requirements," such as "consolidat[ing] job functions" and "improving workflow." (AR 27.)  Preliminary estimates of the total cost for completing these Projects fell between 40 and 60 million dollars.  Of the 27 Projects, seven involved the demolition of facilities.  New construction would result in the disturbance of 25.1 acres of lawn and a net increase of 1.2 acres of new impervious surface.

As discussed more below, defendants focus on the language in the draft EA describing the Projects required to meet the "current" mission requirements.  Specifically, in its consideration of comments, the NGB noted that the "projects are related to the current mission and are independent of the F-35 EIS basing decision." (AW 11728.)  For example, Project No. 15, concerned the replacement of the boundary fence, which was not up to current airport standards requiring that the fence be at least ten feet tall.   A new fence was in part necessary to create a security perimeter in the maintenance area.

Similarly, Project No. 19 involved the construction of a "1,500 SF bay on the south side of B430 for a second crash truck," which the NGB explained at the time would "provide adequate space needed to fulfill mission requirements." (AR 30.)

On February 7, 2019, a draft Description of Proposed Action and Alternatives was circulated to various stakeholders, including other federal and state agencies and federally-recognized tribes. The ANG received two responses, one of which was no comment. The other was a letter from the EPA providing comments relating to "water quality, wetlands, air quality strategies, stormwater management and transportation resiliency, legacy pollution, environmental justice, pollinators and native plant species, energy efficiency, recycling and reuse of construction materials, cumulative impacts, and consultation records." (AR 137.)

In April 2019, the ANG issued notice of the draft EA and draft Finding of No Significant Impact ("FONSI"), and invited public comments through May 21, 2019. Specifically, the NGB placed notice of the draft EA in the Wisconsin State Journal. On October 22, 2019, the ANG signed a FONSI and issued the final EA.

Ultimately, with respect to the PFAS described above, the NGB included the following language in the final EA for the proposed action based on the SI findings:

> [a] Media Management Plan [("MPM")] is recommended for two project areas. If any contaminated media (e.g., soil, groundwater) were encountered during the course of site preparation (e.g., clearing, grading) or site development (e.g., excavation for installation of building footers) for any of the projects under the Proposed Action, samples will be collected to determine whether the media are contaminated, and contaminated media will be segregated for off-site disposal or for on-site reuse as appropriate.

(AR 11.)  In addition, the Wisconsin DNR raised concerns about Project 15 (construction of the new boundary fence) and Project 19 (construction of the second crash truck bay) as projects "likely to encounter PFAS."  (AR 11743.)  In response, the NGB explained that given the depth of groundwater, approximately seven to eight feet below the surface, the projects were unlikely to encounter ground water.  Nonetheless, "[t]o mitigate possible soil disturbance and exposure of PFAS contamination, the EA will recommend a media management plan . . . for all sites where PFAS contamination is expected or whether further investigation indicated possible contamination."  (*Id.*)  The NGB concluded in the final EA that "[w]ith proper media management no *further* contamination or migration of PFOS or PFOA from the soil or groundwater would be expected to occur."  (AR 101-02.)

With respect to environmental justice, and specifically concerns about minority communities' exposure to PFAS, the NGB concluded that:  (a) "populations, including minority populations and low-income populations outside the boundaries of the installation and airport, will not be significantly impacted by implementation of the Proposed Action"; and (b) "[t]herefore, implementation of the Proposed Action will not disproportionately impact minority or low-income populations."  (AR 11.)  Specifically, the NGB found that "contamination within Starkwater Creek is not expected to increase due to construction" because "excavated soil and/or groundwater would be properly disposed of," and "[t]he two Proposed Action projects within the footprint of [the PFAS PRLs] would include the development of a [MMP] if contamination is still present above federal and/or state regulatory limits at the time of construction."  (AR 94.)

The final EA also provided estimates for emissions from the Projects, calculated using the Air Force's Air Conformity Applicability Model.   Specifically, the final EA explained that:

> The proposed construction activities would contribute directly to GHG emissions from fossil fuels.   Demolition and construction activities would generate 3,405 tons of $CO_2e$ emissions in 2020.   To put these emissions in perspective, 3,405 tons of GHGs is the equivalent of 665 cars driving the national average of 11,500 miles per year.

(AR 78.)  The final EA also noted that the operation of the new facilities may result in "a small increase" in GHG emissions.   (*Id.*)   Still, the NGB found that the GHG emissions generated from the Proposed Action "alone would not be enough to cause global warming," though they would "contribute incrementally."   (*Id.*)

### D. Environmental Impact Statement for Basing F-35A Fighter Jets at Truax Field

Around the same time as the ANG was preparing the final EA for the Projects at issue in this case ("the Proposed Action"), the United States Air Force was preparing an Environmental Impact Statement ("EIS") for basing F-35A fighter jets.  The EIS reviewed and analyzed five bases as future sites for locating F-35A aircraft, including the 115 FW installation at Truax Field.  The Notice of Intent to conduct the EIS was published on February 7, 2019, and the draft EIS was issued for comment on August 9, 2019.   After receiving and responding to comments from the public, the final EIS was published on February 28, 2020.  The EIS is the subject of a separate lawsuit brought by the same plaintiff in the United States District Court for the District of Columbia.  *See Safe Skies Clean Water Wisconsin Inc. v. U.S. Air Force*, No. 21-634 (D.D.C.).

7

Defendants argue that the final EA for the 27 Projects at issue in this case does *not* analyze the effects of basing F-35As at Truax Field, but contend instead that the NGB recognized that "[i]mpacts to land use due to noise under the proposed USAF F-35A Air National Guard Operational Beddown would be significant," and that "[t]he replacement of the F-16 with the F-35A would result in an increase in long-term emissions."  (AR 108-09.)  For its part, plaintiff noted other references in the EA that discuss the proposed F-35A fighter jets, including:   additional proposed construction projects (AR 105-07); significant impact on environmental justice due to noise (AR 113); possible impact on bat population (AR 456); efforts to coordinate with the EIS for the F-35A project for purposes of developing an architectural survey (AR 468); and responding to a comment that the EA should consider cumulative effects of the proposed F-35A beddown project by stating that the EA *does* describe cumulative effects (AR 11734).

### E.  Overview of Plaintiff

Safe Skies Clean Water Wisconsin, Inc., is a nonprofit organization, with the purpose of educating the public concerning the dangers inherent in basing F-35A Joint Strike Fighter jets at Truax Field, as well as the need for the NGB, the ANG and the Air Force to clean-up existing contamination of groundwater, surface water, drinking water and soils, caused by the use of fire-fighting foams and other materials at the 115 FW installation.[3]  Specifically, Safe Skies is concerned with PFAS emitted from Truax Field,

---

[3] Defendants challenge plaintiff's submission of affidavits outside of the administrative record, but as plaintiff explained in its opposition brief, these affidavits were submitted to establish standing, and the law is clear the consideration of affidavits outside of the administrative record is proper in determining whether a plaintiff has standing.  *Sauk Prairie Conservation Alliance v. U.S. Dept. of*

including from the installation, that pollute municipal wells, groundwater, soil, and Starkweather Creek, which drains to the area around Truax Field and flows into Lake Monona.  Both Starkweather Creek and Lake Monona are on the 2018 Wisconsin Impaired Waters List for multiple pollutants. In addition, Safe Skies is also concerned with the noise impact from the F-16s and proposed F-35s.

Safe Skies purports to further its mission by informing the local citizenry about NGB's plans, including through use of its mailing list of over 2,000 people.  Since 2018, Safe Skies has also sponsored a series of public forums, had representatives appear on radio shows, and brought speakers to Madison for presentations, press conferences and interviews.  Through declarations of three of its members, plaintiff further avers that its members will be harmed by the Projects described above, who drink from wells that already have PFAS in them, recreate in Lake Monona, and eat fish from Starkweather Creek and Lake Monona.  Moreover, many of Safe Skies' supporters live close to the airport and in the flight path of the F-16s and F-35s, who and ill suffer from the increased noise of the F-35s.

OPINION

## I.  Standing

As an initial matter, the court agrees with plaintiff Safe Skies that it has organizational standing to bring this action, a finding that defendants do not challenge.  In

---

*Interior*, 320 F. Supp. 3d 1013, 1021-22 (W.D. Wis. 2018).  Accordingly, the court considers these submissions for that limited purpose, while disregarding declarations as to extensive PFAS in municipal wells close to Truax Field, which were not part of the AR.

order to satisfy Article III's standing requirement, individual plaintiffs must prove three elements: (1) they have suffered an "injury in fact" that is both "concrete and particular" and "actual or imminent"; (2) that injury is "fairly traceable" to defendants' conduct; and (3) "the injury will [likely] be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal citations omitted). As a member organization, Safe Skies may demonstrate standing by establishing either standing to sue in its own right or standing to sue on behalf of members. To demonstrate associational standing to sue on behalf of its members, an organization must show: (1) its members would have standing to sue; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) its claims do not require participation of individual members. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

As detailed in the declarations submitted by three of Safe Skies' members, Steve Klafka, Edward Blume and Tehmina Islam, the court finds that each has described an injury that is concrete, particular, actual or imminent, and traceable to defendants' conduct, which could be redressed by a favorable ruling in this court. Moreover, the interests that Safe Skies seeks to protect in bringing this lawsuit are germane to its purpose of educating the public about basing F-35A fighter jets at Truax Field and about water safety issues due to PFAS in and around Truax Field. Finally, the NEPA claims brought in this lawsuit are grounded in an existing administrative record, which does not require the participation of individual members to adjudicate.

## II. Merits Challenge

The National Environmental Policy Act ("NEPA"), 42 U.S.C § 4321 *et seq.*, requires

10

agencies to analyze and disclose significant environmental effects.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."  *Id.* Specifically, NEPA requires federal agencies to prepare an EA for "major Federal actions significantly affecting the equality of the human environment."  42 U.S.C. § 4332(c).  The EA is then used to determine whether to prepare a more thorough EIS or to issue a FONSI. *See Rhodes v. Johnson*, 153 F.3d 785, 788 (7th Cir. 1998); 40 C.F.R. § 1508.9(a)(1).

While NEPA describes the responsibilities of federal agencies in considering environmental impacts for various projects, the court's review of defendants' treatment of the environmental effects of the Proposed Actions (the 27 Projects) is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Under the APA, a federal court may only hold unlawful or set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2); *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (describing the court's role as determining "whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment").  "Under both the 'arbitrary and capricious' and 'substantial evidence' standards, the scope of review is narrow and a court must not substitute its judgment for that of the agency."  *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 547 (7th Cir. 2012).  Specifically, as plaintiff acknowledges, "'[t]he only role' for a court in applying the arbitrary and capricious standard in the NEPA context 'is to insure that the agency has taken a "hard look" at environmental consequences.'"

11

*Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952-53 (7th Cir. 2003) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

Having found that plaintiff has standing to pursue its challenge to defendants' evaluation of the Proposed Action, therefore, the court turns to the merits of plaintiff's assorted challenges, most of which were presented in a cursory fashion.[4]

### A.  Failing to Prepare an EIS

Plaintiff's primary challenge is that defendants acted arbitrarily and capriciously, abused their discretion or otherwise did not act in accordance with NEPA by relying on an EA and failing to prepare an EIS with respect to the Proposed Actions.  Specifically, plaintiff argues that "[t]he EA fails to take a hard look at the effects of the construction and land disturbance on the soil and water and potential releases of hazardous substances." (Pl.'s Opening Br. (dkt. #14) 13 (citing *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 954 (7th Cir. 2003)).)  However, as detailed above, the NGB did *not* ignore the presence of PFAS at Truax Field or in the surrounding area.  Instead, the NGB commissioned two investigative reports, a preliminary assessment, identifying potential locations of releases of the aqueous film forming foam, as well as a more detailed site inspection confirming the

---

[4] In its opening brief, plaintiff also argued that defendants violated NEPA by failing to adequately address alternatives, but recognized in its reply brief, that it waived this issue by failing to raise this challenge in its comments to the circulated draft EA.  (Pl.'s Reply Br. (dkt. #25) 12.)  *See DOT v. Pub. Citizen*, 541 U.S. 752, 764 (2004) ("Because respondents did not raise these particular objections to the EA, [the agency] was not given the opportunity to examine any proposed alternatives to determine if they were reasonably available.  Respondents have therefore forfeited any objection to the EA on [that] ground[.]").

presence of PFAS in nine identified locations within the 115 FW installation.  (AR 11563-83, 1941-2004.)

Based on this information, NGB further acknowledged the presence of PFAS, developed a Media Management Plan or "MPM" for the two Project areas identified by the Wisconsin DNR as likely to encompass PFAS *and* provided that contaminated media for "*any* of the projects" would be collected and segregated for proper disposal.  (AR 11 (emphasis added).)  With respect to the two projects for which the Wisconsin DNR raised specific concerns, Projects 15 and 19, the final EA also concluded that given its depth in those project areas, those projects were unlikely to encounter groundwater, and even if they did, the MPM would take appropriate steps to ensure "no *further* contamination . . . from the soil or groundwater would be expected to occur."  (AR 101-02, 11743.)  *See also Sauk Prairie Conservation All. v. U.S. DOI*, 944 F.3d 664, 678 (7th Cir. 2019) (explaining that when "an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference").

To be fair, the EA does not present a plan to mitigate PFAS and other contamination at Truax Field, but a robust, comprehensive plan to address these legitimate concerns are not within a fair reading of the purpose of the EA for the Proposed Action.  *See Robertson*, 490 U.S. at 350 (requiring examination of "adverse environmental effects *of the proposed action*") (emphasis added); *Mineta*, 349 F.3d at 954 ("[T]he key question is whether there is a nexus between the [] Project, which the defendants are implementing and which NEPA and its regulations govern, and the *preexisting* contamination . . . which, apart from the

13

Project, NEPA and its regulations do not affect.').  Given that this is all that is required under the plain meaning of NEPA, plaintiff has failed here at minimum to demonstrate that defendants did not take a "hard look" at the environmental effects of the Proposed Actions by relying on an EA rather than preparing a more intensive EIS.

### B.  Failing to Prepare a Supplemental EA

Relatedly, plaintiff contends that new information from the Wisconsin Department of Natural Resources and the City of Madison became available about PFAS at and around Truax Field as the EA was being finalized, which required defendants to supplement the EA under 40 C.F.R. § 1502.9(c)(1).  (Dkt. #14 at 13.)  Specifically, that section requires an agency to supplement either a draft or final EIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9.

As an initial matter, the plain language of § 1502.9 addresses supplementing environmental impact statements only.  *See Marsh*, 490 U.S. at 374 (discussing requirement to prepare a supplemental *EIS* under NEPA).  Even assuming that § 1502.9 applies to an EA as well, the new information plaintiff points to simply concerned state and local actors' efforts to address PFAS contamination, not new information about how the Proposed Action (the 27 Projects) would impact the preexisting PFAS.  Specifically, plaintiff points to evidence that (1) the DNR sent a letter to the City, Dane County and the ANG in October 2019, notifying them that they were all legally responsible for contamination at two "burn pits," where firefighters had trained with PFAS foams; (2) the Mayor of the City of Madison sent an October 2019 letter calling on the ANG to address

14

contamination; and (3) by November 2020, the City was making efforts to obtain additional funds for PFAS testing. (Pl.'s Opening Br. (dkt. #14) 15.) As explained above, however, NEPA concerns the effects of new federal projects on environmental conditions, not required remediation of preexisting environmental issues. *See Robertson*, 490 U.S. at 350; *Mineta*, 349 F.3d at 954. At minimum, plaintiff has failed to direct the court to any legal support for a broader construction of NEPA's reach. Accordingly, the court concludes that plaintiff has failed to demonstrate defendants' failure to produce a supplemental EA for the Proposed Action violated their obligations under NEPA.

### C. Improperly Segmenting Projects

Next, plaintiff contends that defendants improperly "segmented projects," treating the Proposed Action at issue here as separate from the decision to base F-35A aircraft at Truax Field. The NEPA regulations require that actions that are "similar" or "connected," or that have "cumulatively significant impacts," must be considered together in one EIS. 40 C.F.R. § 1508.25(a). As the Seventh Circuit explained in *Mineta*, "'[s]egmentation analysis functions to weed out projects which are pretextually segmented, and for which there is no independent reason to exist. When the segmentation project has no independent justification, no life of its own, or is simply illogical when viewed in isolation, the segmentation is invalid." 349 F.3d at 962 (quoting *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1139 (5th Cir. 1992)); *see also Swain v. Brinegar*, 542 F.2d 364, 369 (7th Cir. 1976) (explaining that in reviewing this requirement, courts should consider "whether the proposed action has an independent utility of its own" (internal citation and quotation marks omitted)).

15

As detailed in the record above, a number of the 27 Projects comprising the Proposed Action evaluated in the final EA were first proposed in 2012, well before the decision to select Truax Field as one of the two locations for deployment of F-35As in April 2020. Indeed, a draft EA was circulated in early 2019, with the final EA and FONSI issued in October 2019, all of which occurred before Truax Field was even identified as one of the five finalists for placement of the F-35As deployment in February 2020. Moreover, as detailed in the EA, the Proposed Action was deemed necessary to support the *current* mission requirements, not the deployment of F-35As to the 115 FW installation. (AR 27, 11799.) In fact, in its consideration of comments, the NGB noted that the "[P]rojects are related to the current mission and are independent of the F-35 EIS basing decision." (AW 11728.) Finally, at the time the EA was finalized in October of 2019, to the extent Truax Field was a possible location for the F-35As' deployment, an update of the EA was at most premature, and at least wholly unnecessary, since each of the five finalists' locations were subject to a full EIS before possible selection. On this record, therefore, the court agrees that plaintiff has failed to demonstrate that defendants acted arbitrarily, capriciously, with an abuse of discretion, or otherwise not in accordance with law in considering the environmental impact of the Proposed Actions separate from any ultimate decision to base F-35A jets at Truax Field.[5]

---

[5] Relying on the same claim of improper segmentation, plaintiff also argues that defendants violated NEPA by failing to consider climate change. (Pl.'s Opening Br. (dkt. #14) 20.) Having concluded that defendants were not obligated to consider the environmental effect of the decision to base F-35A jets in the EA on the Proposed Action at issue here, the court rejects this argument as well. Of course, plaintiff may pursue this argument in its challenge to the decision to "beddown" F-35A jets at Truax Field in its challenge to the EIS for that proposed action currently pending before the District of D.C. in *Safe Skies Clean Water Wisconsin Inc. v. U.S. Air Force*, No. 21-634 (D.D.C.).

### D. Failing to Consider Cumulative Effects

Plaintiff further challenges the EA for failing to consider the cumulative impact of increased PFAS emissions.  Certainly, NEPA regulations require an agency to consider "cumulative" impacts of any proposed action, which the regulation defines as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions."  40 C.F.R. § 1508.8. Here, plaintiff complains about the Proposed Action "increas[ing] PFAS emissions" and "the deafening noise and air and water pollutants from F-35s."  (Pl.'s Opening Br. (dkt. #14) 17.)  However, those complaints rest on the same arguments already addressed above:  the EA failed to take a hard look at PFAS contamination and improperly segmented the decision to base the F-35A gets at Truax Field.  As detailed above, the NGB *did* consider potential PFAS contamination, including the exacerbation of existing contamination, caused by the Proposed Actions in the EA.  Moreover, because the Proposed Action was independently justified, the EA had no obligation to consider what was then only a *possible* beddown of F-35A jets.  Regardless, the EA *did* consider the possible cumulative impacts, including to noise and emissions.  (AR 108-09.)  For the same reasons as described above in rejecting plaintiff's largely duplicative arguments, the court similarly concludes that defendants did not act arbitrarily, capriciously, abuse its discretion, or otherwise acted outside the law in considering the cumulative effects of environmental impacts as required by NEPA.

### E.  Failing to Adequately Consider Environmental Justice

Plaintiff separately contends that defendants failed to consider environmental justice.  Specifically, plaintiff argues that the EA failed to consider whether "a project will have a disproportionately adverse effect on minority and low-income populations" as required under 59 Fed. Reg. 7629 (Feb. 16, 1994).  *See* 32 C.F.R. § 989.33 (requiring compliance with this executive order).   Here, too, plaintiff fails to address the administrative record.   As described above, defendants *did* consider the possible environmental impact of the Proposed Action on lower-income and minority populations living near Truax Field.  Specifically, the EA concluded that because the Proposed Action was not likely to implicate PFAS contamination, there would be no disproportionate adverse effect on the community living close to Truax Field, whether or not low income or minority.  As discussed, the EA also found in the event that PFAS were implicated, a Media Management Plan had been developed to appropriately deal with any contamination.  *See Sierra Club v. FERC*, 867 F.3d 1357, 1369 (D.C. Cir. 2017) ("The agency also independently concluded that the project would not have a 'high and adverse' impact on *any* population, meaning, in the agency's view, that it could not have a 'disproportionately high and adverse' impact on any population, marginalized or otherwise." (emphasis added)).  On this record, the court concludes that defendants met their obligations under NEPA's related regulations, or again plaintiff has failed to demonstrate a violation of the APA in failing to do so.

### F.  Failing to Provide Adequate Notice and Public Participation

Finally, plaintiff contends that defendants violated NEPA and the APA by failing to

provide adequate notice and opportunities for public participation.  Specifically, plaintiff argues that the notices should have been placed in local community centers and free publications, as well as that NGB should have held a public hearing.  In pertinent part, the relevant regulation charges NGB to:

> (a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures (§ 1507.3 of this chapter).
> (b) Provide public notice of NEPA–related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions. When selecting appropriate methods for providing public notice, agencies shall consider the ability of affected persons and agencies to access electronic media.

40 C.F.R. § 1506.6.

As described above, NGB did issue two notices in the Wisconsin State Journal and solicited comments.  While not as robust as plaintiff or even the court might have preferred, this notice met the requirements of § 1506.6.  At minimum, plaintiff has again failed to demonstrate that defendants acted arbitrarily or capriciously, abused their discretion or otherwise did not act in accordance with the law by limiting its notice to that published in the Wisconsin State Journal.  *See* § 1506.6(b)(3) (specifically authorizing notice to be placed in local newspapers).  Finally, as plaintiff acknowledges, there is no legal obligation to hold a public hearing as opposed to soliciting written comments.  (Pl.'s Opening Br. (dkt. #14) 21 (citing *River Road Alliance, Inc. v. Corps of Engineers of U.S. Army*, 764 F.2d 445, 451 (7th Cir. 1985)).)

19

Having rejected plaintiff's numerous challenges, the court concludes that summary judgment in defendants' favor is warranted.

## ORDER

IT IS ORDERED that:

1) Plaintiff Safe Skies Clean Water Wisconsin, Inc.'s motion for summary judgment (dkt. #12) is DENIED.

2) Defendants National Guard Bureau and Daniel R. Hokanson's motion for summary judgment (dkt. #18) is GRANTED.

3) The clerk's office is directed to enter judgment in defendants' favor and close this case.

Entered this 3rd day of January, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

20